# Illinois Official Reports

## Appellate Court

*Roman v. Cook County Sheriff's Merit Board*, 2014 IL App (1st) 123308

| | |
|---|---|
| Appellate Court Caption | GERALDO ROMAN, MANUEL HERRERA, MICHAEL DESENA, JOHN VERNER, FRANCISCO YERENA, HOWARD DAVIS, and MICHAEL CERAMI, Plaintiffs-Appellants, v. COOK COUNTY SHERIFF'S MERIT BOARD and THOMAS J. DART, Sheriff of Cook County, Defendants-Appellees. |
| District & No. | First District, Fifth Division<br>Docket Nos. 1-12-3308, 1-12-3309, 1-12-3310, 1-12-3311, 1-12-3312 cons. |
| Filed | August 1, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a consolidated appeal from the trial court's decision upholding rulings of the Cook County Sheriff's Merit Board suspending or terminating the employment of seven correctional officers based on their unauthorized secondary employment as security guards in establishments selling intoxicating liquor, the appellate court directed the Board to vacate the termination of one officer and reinstate him retroactively and to vacate the terminations of two others and reduce the penalty to 180-day suspensions, and the balance of the Board's rulings were affirmed. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 10-CH-8293, 10-CH-7964, 10-CH-7968, 10-CH-7965, 10-CH-7961; the Hon. Sophia Hall, Judge, presiding. |
| Judgment | Affirmed in part; reversed in part; remanded with directions. |

| Counsel on Appeal | Cass T. Casper, of Teamsters Local 700 Legal Department, of Park Ridge, for appellants. |
| | |
| | Baumann & Shuldiner, of Chicago (Deidre Baumann, of counsel), for appellant Francisco Yerena. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., James Pullos, and Karen Dimond, Assistant State's Attorneys, of counsel), for appellees. |

| Panel | JUSTICE PALMER delivered the judgment of the court, with opinion.<br>Justices McBride and Taylor concurred in the judgment and opinion. |

**OPINION**

¶ 1     In these five consolidated cases, plaintiffs Geraldo Roman, Manuel Herrera, Michael DeSena, John Verner, Francisco Yerena, Howard Davis and Michael Cerami appeal from an order of the circuit court of Cook County affirming the rulings of the Cook County Sheriff's Merit Board (the Board) in which the Board suspended or terminated plaintiffs' employment as Cook County correctional officers on the basis that plaintiffs had, *inter alia*, engaged in unauthorized secondary employment. On appeal, plaintiffs contend that the Board's decision-making procedures violated the Illinois Administrative Procedure Act (5 ILCS 100/1-1 *et seq.* (West 2008)), the Board's findings were against the manifest weight of the evidence and the imposed discipline was arbitrary and capricious. We affirm in part, reverse in part and remand to the Board with instructions.

¶ 2                                     BACKGROUND

¶ 3     Plaintiffs were employed by the Cook County sheriff as officers with the Cook County department of corrections (DOC). On June 3, 2009, following an investigation by the Sheriff's Office of Professional Review (OPR), Sheriff Thomas J. Dart (Sheriff) filed complaints with the Board against plaintiffs, seeking suspension or termination of their employment. The Sheriff charged that, in violation of assorted DOC general orders, sheriff's orders and the Board's rules and regulations, plaintiffs worked in secondary jobs as security guards at establishments in Berwyn and Cicero, Illinois. In the complaints, the Sheriff specified the particular establishments at which each officer worked and asserted that all the establishments had as their primary business the selling of intoxicating liquor. He charged that plaintiffs had not requested permission from the DOC or the Sheriff's office to engage in secondary employment, had not obtained indemnity forms from their "secondary" employers for the

security work they were performing and falsely reported to OPR investigators that they did not work security for Mike Holmes, a DOC superintendent.[1]

¶ 4    The Sheriff also charged plaintiffs with assorted individual violations. Specifically, he charged that Roman also worked secondary employment as an auxiliary police officer for the Berwyn police department without permission. He charged that Herrera, by his own admission, had failed to report to the Sheriff's department or a supervisor that he had been involved in an altercation at Tapas (an establishment serving food and liquor) while working security there, four individuals were arrested as a result, he had signed criminal complaints and had failed to appear in court on the complaints. The Sheriff charged that DeSena, while assigned to OPR, had provided security services to the disc jockey (DJ) at Tapas, had also worked at San Marcos (an establishment serving food and liquor) and had displayed his Sheriff's badge around his neck while doing so.

¶ 5    The Sheriff charged that Verner had used excessive force against and stolen from patron Miguel Pineda while working as security at Guadalajara's (an establishment serving food and liquor) on August 25, 2007, and Pineda had filed a federal civil rights lawsuit against Verner as a result. The Sheriff asserted that Verner failed to notify the Sheriff's office of the lawsuit. He also asserted that Verner falsely reported to OPR investigators that he had never worked at a bar in Berwyn or Cicero, worked at Guadalajara's, choked Pineda or stolen from Pineda.

¶ 6    The Sheriff charged that Yerena had "falsely reported" to OPR investigators that he did not work security in bars in Cicero or Berwyn, he had never worked security in bars in Cicero or Berwyn, he had never worked at Guadalajara's, his badge was not displayed and he was not compensated. The Sheriff charged that Davis had "falsely reported" to OPR investigators that he did not work security in bars in Cicero or Berwyn and that he did not remember working security at San Marcos on April 19, 2008, even though his signature was on a "victim's Refusal to Prosecute" form related to an altercation at San Marcos on that date.

¶ 7    The Sheriff charged that Cerami was working security at Guadalajara's on August 25, 2007, was present when Verner used excessive force on and committed theft from Pineda and himself used excessive force against Pineda. It charged that Cerami failed to notify a supervisor in the sheriff's office regarding the altercation or the sheriff's legal department regarding the lawsuit filed by Pineda as a result. The Sheriff asserted that, although Cerami admitted to occasionally working at Guadalajara's, he falsely reported to OPR investigators that he did not remember working there on August 25, 2007, or on April 5 and 6, 2008.

¶ 8    Plaintiffs moved to dismiss, arguing that the establishments where they had worked were licensed as restaurants and not as bars, and the primary business of the establishments was not the sale of intoxicating liquor. The Board denied the motions and set the cases for a joint hearing.

¶ 9    At the hearing, the Board heard testimony from Cook County Sheriff's Department Chief Michael Holmes. Holmes testified that he had run a security business in Berwyn and Cicero at Tapas, San Marcos, La Quinta and three Guadalajara's. He had started the business just prior to New Year's Eve in 2007 and ended it in August 2008, after OPR accused him of not filing secondary employment forms and of official misconduct. Holmes stated he had started the

---

[1]The Sheriff filed similar complaints against correction officers Benito Enriquez, Christopher Dellutri and Eric King, which are not part of the instant appeal.

business because "Berwyn Police for a number of years ran all the details in [Berwyn or Cicero], and the guys that ran that had called [him] because they had taken on so many more businesses that they didn't have enough Berwyn policemen to fill all the spots."

¶ 10    Holmes stated that approximately 15 people had worked security for him, providing security "at restaurants[;] *** they were more used as a deterrent than anything else, checking [identification cards (IDs)], and just making sure no problems happened at the place." He testified that his men typically worked Fridays and Saturdays, from 10 p.m. or 11 p.m. to 3 a.m. Asked whether he was personally working "some of these bars" himself, Holmes stated he sometimes did.

¶ 11    With regard to scheduling the security staff, Holmes stated that "a guy by the name of Tinoco was the one who organized everything" and who made sure that the security people "show[ed] up" to work when they were supposed to. Holmes testified that he did not personally recruit anyone to work security, explaining "[t]he best way I can explain it is when Berwyn called me that they needed some guys to work, basically anyone I came in contact with or–mainly it was Joe Tinoco that would get friends of his to come and work." He stated that he did not invite any of the officers named in the OPR investigation to work. Holmes admitted that, although he did not recruit or schedule "the guys," he received $2 per hour from "Berwyn" for every hour his men worked, being paid for what Tinoco was doing. He did not split the money with Tinoco. Holmes testified that he had no payroll or other records for the business, it had no name and was not incorporated.

¶ 12    Holmes testified that the places employing his security staff were restaurants, but that IDs were checked to make sure that anyone coming in for a drink was at least 21 years old. "Being a restaurant, you had a mix of families and just regular people coming in to have a drink." Asked whether the establishments, although called restaurants, primarily served alcohol from 10 p.m. on, Holmes stated that the establishments "would serve alcohol but they had to have the kitchen open to–for anyone to order to stay in with their license."

¶ 13    Holmes testified that he was raised in the Berwyn/Cicero area and was familiar with the assorted establishments where the security staff worked. He visited the establishments on weekends "late at night," two to three times a month. He would visit three establishments per night, spending 15 to 20 minutes at each socializing with the patrons. Holmes stated that, during the time that his "guys" were working security at the places, from 10 p.m. to 3 a.m., he observed "more drinking" than people being served food. He had checked the licenses of the restaurants and they were licensed as "restaurant first" and "entertainment second." The security officers were paid by the business owners at the end of the night and he would sometimes collect the money from the owners and pay the officers for the night.

¶ 14    Holmes testified that, during his time working security, he had responded to incidents at the named establishments. He explained security's role in those situations as "[t]he main thing would be escorting out people that were inebriated beyond the point of being able to handle themselves, so the guys would be more proactive in removing them than getting into an altercation."

¶ 15    Holmes admitted that he did not have "approved secondary employment" for his security work. He did not require any officers that were allegedly working for him to have secondary employment forms approved. He testified that he would have been required to have approved secondary employment forms for everybody working for him who performed security work but he did not.

- 4 -

¶ 16    Plaintiffs were present in the hearing room and Holmes identified each of them. He testified that DeSena worked security for Holmes's business at Tapas. Holmes stated that he knew DeSena and, over the year and a half that Holmes had the security business, he saw DeSena at Tapas on two occasions, including one where DeSena was "helping the DJ out in some kind of business transaction they had." He did not see DeSena wearing badge.

¶ 17    Holmes testified that Roman worked security for him at La Quinta. He knew Roman worked there because, when he stopped at La Quinta to socialize, he would talk to Roman and "[w]e had worked on a couple occasions at La Quinta together." He saw Roman there 5 to 10 times over the year and a half that he owned the business. Holmes did not see Roman wearing a badge, police equipment or indicia that he worked for the establishment or as security.

¶ 18    Holmes testified that Herrera worked for him at Tapas, the same location as DeSena. He stated that he saw Herrera at Tapas "maybe a couple times," when he went to Tapas to socialize. On one occasion, he went to Tapas after receiving a phone call, either from Tapas's owner or from Herrera, when Herrera was involved in an altercation "and his head was split open." He responded as "a friend," not in an official capacity. He stated that he did not have personal knowledge that Herrera was working at Tapas at the time of the incident, but "the Berwyn police came and they wrote him up as he was doing security in the bar." Holmes testified that Herrera neither wore indicia showing that he worked for Tapas or for security nor displayed police equipment.

¶ 19    Holmes testified that Davis worked security for Holmes at San Marcos and that Verner, Yerena and Cerami worked for him at Guadalajara. However, he did not have personal knowledge regarding the officers working as security and had not seen any of them actually working as such. He stated he knew Davis worked at San Marcos and Verner and Yerena worked at Guadalajara from Tinoco.[2]

¶ 20    Holmes testified that he was participating in the hearing under a subpoena and not because of a settlement agreement or compromise with the Sheriff regarding the allegations directed to his involvement in the matter. As a consequence of the investigation, he had been demoted from superintendent to chief, which meant a $5,000 reduction in salary, and had been suspended for 60 days. He had already served the suspension at the time of the hearing. He considered the suspension unfair because, in his experience, a suspension for working a secondary job without approval was a three- to four-day suspension "with options."

¶ 21    OPR investigator David Shilling testified that he began an investigation after "OPR had received a complaint register signed by Chief Kushner of the Berwyn Police Department alleging certain allegations against two correctional officers" and "[a]t approximately the same time, we received a letter and a surveillance tape from the State's Attorney's office naming the same officers." He testified that, in conjunction with his investigation, he interviewed DeSena regarding "secondary employment in Berwyn and Cicero." Presented with a document titled "typed statement memo," Shilling identified it as the statement he typed while speaking with DeSena. He stated that he typed up DeSena's answers to his questions as he went along and

_____

[2]Holmes testified that Dellutri worked for him at San Marcos. He stated that he saw Dellutri at San Marcos 5 to 10 times over the year and a half and knew Dellutri was working there because Dellutri told him so or because Holmes was working with Dellutri. He did not see Dellutri wearing a uniform, badge, police equipment or anything to indicate that he was part of a security staff.

gave DeSena an opportunity to review and correct the statement. DeSena made no corrections, initialed the statement at the bottom of each page and signed the last page.

¶ 22    Investigator Shilling testified similarly with regard to speaking with and taking statements from Davis, Yerena, Roman, Herrera, Cerami, and Verner regarding the secondary employment investigation. In the same investigation, he took statements from Eric King and Christopher Dellutri. OPR investigator Eric Schroeder was present for all of the interviews and, in some cases, the officer being interviewed had counsel or a union representative present. Shilling testified that after each interview, he had the officer review his statement (hereinafter, OPR statement) in order to make any corrections. He stated none of the officers made any changes to their statements. Each signed the last page of their respective statement and some initialed every page. The hearing officer barred Shilling from testifying regarding the content of the statements or his conversations with the officers but admitted the statements into evidence.

¶ 23    Shilling testified that, as part of his investigation, he "looked into" an August 25, 2007, incident at Guadalajara's for which his office had obtained a Berwyn police report. He learned that the victim named in the report was "Mr. Pineda" and a civil suit had been filed against Verner and Cerami as a result of the incident. Shilling stated that Verner and Cerami had an obligation to report the legal action to the Sheriff's department and his "office" determined that neither had done so. Shilling testified that he did not know whether Verner and Cerami had been served with the lawsuit at the time of their interviews.[3]

¶ 24    The hearing officer admitted into evidence a copy of a first amended complaint filed by Miguel Pineda against Verner, Cerami and Guadalajara restaurant in the United States District Court for the Northern District of Illinois. The complaint charged that, on either the late night of August 24, 2007, or the early morning of August 25, 2007, Verner and Cerami forcibly removed Pineda from Guadalajara's and variously put him in a choke hold, threw him down a flight of stairs, and punched, stomped and beat him. Pineda asserted Verner then stole $300 from him. He asserted that Verner and Cerami "were working as security staff at Guadalajara's Restaurant, but were also wearing black shirts that stated the word 'police' on the shirts in white lettering." Pineda sought compensatory damages for the injuries he suffered as a result of Verner's and Cerami's actions, asserting claims for battery and for use of excessive force in violation of his rights under the fourth and fourteenth amendments of the United States Constitution.

¶ 25    Copies of two affidavits of personal service show that the process server personally served the federal complaint and summons on Cerami on November 24, 2008, and on Verner on November 25, 2008. The process server averred that Verner "became verbally hostile with [him], and made several remarks using profanity and racial epithets, in which [the process server] believed the remarks were an indication of potentially receiving physical harm from the defendant."

---

[3]In fact, Verner and Cerami had not been served with the complaint at the time Investigator Shilling interviewed them. Shilling interviewed Verner on September 19, 2008, and on November 6, 2008. He interviewed Cerami on October 20, 2008. The affidavits of personal service show that Cerami was served with the complaint on November 24, 2008, and Verner was served on November 25, 2008, after the Shilling interviews.

¶ 26    Shilling testified that OPR is "the Sheriff's Department's version of an internal affairs investigative unit." He stated that he had worked for OPR for four years and had done between 30 to 50 investigations. When he completed an investigation, he compiled a report and submitted it to his director, who would then recommend a disciplinary action for the investigated officer. Shilling testified that he had previously investigated "cases of failure to ask permission to work secondary employment" and in only one case had the recommended disciplinary action been close to a 40-day or more suspension, "but there [were] other factors involved." In his experience, the duration of suspension recommended in the past for "one count of secondary employment request" ranged "from three to five days." He stated he had never investigated secondary employment in "a prohibited establishment" or "where one of the allegations that was sustained was not being truthful in their internal affairs interview." Shilling testified that he had done investigations where the allegations concerned "submitting false reports" and that "past practice" with regard to disciplinary action recommended for such an offense was "merit board separation."

¶ 27    In the statements taken by Shilling, Roman, Herrera, DeSena and Cerami admitted to working secondary jobs without having filled out the requisite authorization form. Verner, Yerena and Davis denied working the secondary jobs.

¶ 28    In Roman's statement, he denied working for Holmes in "bar or lounges in Berwyn and Cicero" but admitted he worked security for Holmes as a volunteer at an event "for a firefighter." Roman told Investigator Shilling that he did not remember whether he was working at Serenatas on 5 April, 2008, or at San Marcos in Cicero on either April 13, 2008, or April 19, 2008. He did not remember an incident in which a person got hurt at San Marcos on April 19, 2008. Roman stated that he had worked security for "restaurants," specifically La Quinta, from January 2008 through June 2008. He had not submitted a secondary employment request for 2007 or 2008. Asked who employed him, he stated "[t]hey were Berwyn coppers had the account and I filled in when needed. The restaurant owners [*sic*]." He stated that the restaurant owners "mostly" did the scheduling and he was paid in cash. Roman told Shilling that he carried his badge around his neck, usually backwards and inside his shirt. Asked whether he was armed while working security in Berwyn and Cicero, he answered "I may have been." Roman admitted that he was rehired as an auxiliary police officer by the Berwyn police department after he came to the Sheriff's office.

¶ 29    In Herrera's statement, he told Investigator Shilling that he was working security at Tapas on December 20, 2007, for the owner when he "got jumped," was injured and had to go to the hospital. He stated that the police report regarding the incident was accurate to the best of his knowledge and criminal complaints against four offenders were filed. Herrera told Shilling that he did not notify a supervisor that he had been involved in an altercation and that the subjects had been arrested. He stated that he worked security at Tapas "once or twice a month depending on the help needed for about 6-8 months" and that his job was "[c]heck ID.'s and always stand where the DJ's were." He did not know who did the scheduling, explaining that "[t]he owner would call" him. He was compensated in cash and the night of the incident was his last night there. While "working security in Berwyn and Cicero," his badge was not displayed and he was not armed. He had not submitted a secondary employment request for 2007 or 2008. Asked to explain his involvement or working relationship with Holmes as a security person in the bars or lounges in Berwyn and Cicero, he responded that he "just" knew Holmes as superintendent in "the department."

¶ 30    In DeSena's statement, he admitted to working security at San Marcos and "at other bars in Berwyn or Cicero," including at Tapas. He told Investigator Shilling that he was employed by "Joe," a Berwyn police officer, to maintain order for "Elias," a disc jockey. He stated that he did not submit a secondary employment request. When asked about Holmes, DeSena responded that Holmes was a friend of his and, to his knowledge, Holmes "doesn't work or schedule security." He stated he did not work for Holmes but for Elias. Elias would ask him whether he could work and give him dates and times. DeSena stated that he was compensated "by favors" because Elias was a handyman and came to DeSena's house and worked for him there. Asked about an incident at San Marcos on April 13, 2008, when the Cicero police arrived, DeSena responded that he was there but not involved in the incident. He told Shilling that, while he worked at San Marcos, his badge was hanging around his neck, "where I always have it," but he was not armed while working security. When OPR started investigating, he stopped working a secondary job because he did not know it was a violation. He identified "Joe in Div. 11, Ron in EXOPS," as also working "various locations in Berwyn and Cicero."

¶ 31    Investigator Shilling took two statements from Verner. In the first, Verner stated he was not working security at Guadalajara in Cicero on April 4-5, 2008, and did not work security at any other bars in Berwyn or Cicero. He stated he did not recall any incident in which his badge was displayed, was not armed in any bar in Berwyn or Cicero and had never submitted a secondary employment form "because I don't work security." Asked to explain his involvement or working relationship with Holmes as a security person in the bars or lounges in Berwyn and Cicero, Verner stated "there is none" and he had no knowledge of Holmes operating security in bars in Berwyn and Cicero. Verner stated that he thought there was "political motivation" behind the investigation of him because he had supported a particular candidate in an upcoming mayoral election and because his wife was "100% Hispanic."

¶ 32    In Verner's second statement, he averred that he had told the truth in his first statement. He stated that he might have been at Guadalajara's on July 25, 2008, but had not been working security. He denied ever picking up any money from any bar owner to be paid to security workers. Asked about a Berwyn police report regarding an incident at Guadalajara's on August 25, 2007, Verner stated he was at the establishment but he was not working. He stated he was with his wife, "drinking and *** dancing." He denied knowing or choking "Miguel Pineda" and taking money from his wallet. He stated he did not know how the Berwyn police got his wrong badge number and "they assumed I was working there." He restated his assertion that the investigation was politically and racially motivated.

¶ 33    In Yerena's statement, he denied working security at Guadalajara's or "at any other bars in Berwyn or Cicero." He told Investigator Shilling that he had no involvement with Holmes as a security person and was not working at Guadalajara in Cicero on July 25, 2008. Yerena responded "no," when asked why his badge was displayed at Guadalajara and whether he was armed at Guadalajara. He stated he did not submit a secondary employment request form for 2007 and/or 2008, never worked security for Holmes, was not compensated for security work and did not pay taxes on his security pay because "I don't work security." Told a uniformed Berwyn police officer came into the bar on July 25, 2008, and asked him to fill out a report, Yerena stated that he did not remember and "[n]o one ask me nothing."

¶ 34    In Davis's statement, he denied that he "ever worked security in bars in Berwyn or Cicero" and denied that he ever worked security at San Marcos. He told Investigator Shilling that he had no relation with Holmes and did not remember an incident at San Marcos on April 19,

- 8 -

2008, when the Cicero police responded. Presented by Shilling with a Cicero "Victim's Refusal to Sign Complaint" report of an incident occurring on April 19, 2008, he admitted the signature on the form was his but stated he did not remember the incident. He stated his badge was not displayed when he was in San Marcos and, when he ate lunch there, he had his gun and handcuffs. Davis stated that he did not work a secondary employment job, had not submitted a secondary employment request for 2007 or 2008, had a working relationship with Holmes "with the County" and did not know anything about Holmes.

¶ 35    In Cerami's statement, he admitted to working at Guadalajara's as a security person, "approximately 3-6 time[s] with in [*sic*] a year." He stated he was employed by the bar owner to "keep an eye on things," was paid in cash and did not work security at "any other bars in Berwyn or Cicero." With regard to scheduling his security work, he stated that he "would be there socially and they would ask me to stay." Cerami did not recall working at Guadalajara's on April 5-6, 2008, or on August 25, 2007. He did not recall being involved in an incident at Guadalajara's on August 25, 2007, and did not notify a supervisor that he was involved in an off duty incident. He did not display his badge while working at Guadalajara's and was not armed. He had not submitted a secondary employment request form. Asked to explain his involvement or working relationship with Holmes as a security person in the bars or lounges in Berwyn and Cicero, he responded that his relationship with Holmes was "strictly professional."

¶ 36    The hearing officer next heard testimony from OPR investigator Eric Schroeder. Schroeder testified that, as part of his and Investigator Shilling's investigation regarding officers working secondary employment in Berwyn and Cicero, he conducted surveillance. On July 25, 2008, he conducted surveillance at "Guadalajara's on Ogden and Harlem in the town of Berwyn." He and Shilling were in a minivan outside the entrance to Guadalajara's at 9 p.m. and were there for approximately 1½ hours. He did not notice anyone in particular coming in or out. He "then went inside the bar, on [*sic*] the main level bar, and sat at the bar for approximately 30 minutes."

¶ 37    Investigator Schroeder testified that, for those 30 minutes, he observed "two people standing at the door to the second level checking I.D.'s." He identified Verner and Yerena as the people checking identifications and stated that they would ask to see a patron's identification before they would allow the patron upstairs. He observed Verner and Yerena check "15 to 20" people. Schroeder testified that he was at the first-level bar, approximately 20 feet from Verner and Yerena, who were standing at the entrance to the stairs to the second level. He did not speak to them. Verner and Yerena were not wearing shirts with "police" or "security" on them, did not have their badges around their necks, were not in uniform, did not have handcuffs exposed and, as far as he could tell, were not armed. Schroeder testified that, after 30 minutes, he returned to the van and then took a photograph of Yerena standing in the doorway to Guadalajara's. Schroeder testified that he conducted surveillance several nights from June to August 2008 at the Guadalajara's but did not see Verner or Yerena there on any of those nights.

¶ 38    Retired police officer Michael Spagnolo testified that he was a police officer with the Berwyn police department for 30 years and had recently retired. He had been permanently assigned to work the "midnight shift," from 11 p.m. to 7 a.m. While on duty on August 25, 2007, at 1:10 a.m., he responded to a call regarding a disturbance at the Guadalajara restaurant on Harlem Avenue. He was familiar with Guadalajara's because he had occasionally gotten

calls from there. He was also familiar with a place called La Espanola Tapas, Guadalajara's "on Cermak" and "La Quinta restaurants." Spagnolo estimated that fights would erupt during the night shift at "those locations *** probably maybe two to three times every weekend." He said that, although he did not necessarily respond to the calls, he knew from talking with other officers in his department that "those were the calls received." Spagnolo testified that, from his own experience and from the experiences of his fellow officers, he considered the establishments to be "bars serving alcohol" from "approximately 10:00 o'clock on a Friday and Saturday night till they close at 3:00 o'clock in the morning."

¶ 39    Spagnolo testified that, in this instance, a victim in the parking lot of Guadalajara's told him he was the victim of theft and battery and wanted to make a complaint. Spagnolo stated that he spoke with Guadalajara employees at the scene and "[s]ome were police personnel–believed to be police personnel. They had black shirts on with the word 'Police' on them in white lettering." Spagnolo stated they were not Berwyn police officers but were working at Guadalajara's "as security." He did not see them display badges or ask to see a badge. He did not recall if they were displaying weapons or handcuffs.

¶ 40    Spagnolo testified that he spoke to the security personnel about "them handling this individual that was making this complaint about the battery and the theft." He did not ask them whether they were working there but stated, "I believe they were working there." The men told Spagnolo their names. Refreshing his memory from the report he prepared regarding the incident, Spagnolo testified that the men told him their names were Verner, Cerami and Torres. At his request, they told him their Cook County corrections officer "star numbers." Spagnolo could not identify any of the officers in the hearing room as the men who were at Guadalajara's that night.

¶ 41    Berwyn police sergeant Earl W. Briggs testified that, on August 25, 2007, he received a call in the early morning hours to Guadalajara's on Harlem Avenue. He responded to the scene, where he spoke with "three of their security guards." He knew one by name, Verner, and identified him in the hearing. Briggs stated that he knew "they were security guards" "[b]ecause they were dressed in black with I believe they had 'Police' on their shirts." He testified, "I believe they had handcuffs," but that he did not observe any weapons, mace, radios, stars or badges on them. He stated "they worked at the bar," although Verner was also a Cook County corrections officer. Briggs testified that "they said they were working security at the bar," and "[t]hey said they worked security; they said they were there." He thought Verner told him this but he was not sure. Briggs did not recollect whether Verner told him that the men worked security and saw nothing in the police report showing such.

¶ 42    Sergeant Briggs testified that, in his experience as a sergeant on the midnight shift, La Quinta, Guadalajara's North and La Espanola Tapas (establishments serving food and liquor) were, on Friday and Saturday nights, "frequent stops," with "at least one bar fight a night there." Because "[a] supervisor had to respond to all bar-related calls," he or another supervisor would respond to these calls to supervise the preliminary investigations. Briggs was asked whether, in his experience as a police officer responding to those calls on Friday and Saturday nights from 10 p.m. until the establishments closed, the restaurants "would be serving food primarily or they would be serving alcohol as a bar." He responded "[a]lcohol as a bar." Briggs testified that, although Guadalajara had "a restaurant license that could dispense alcohol," from his personal knowledge working the midnight shift, "after 11:00 o'clock their primary business is to dispense alcohol."

¶ 43      Sergeant Briggs identified Roman as being an auxiliary Berwyn police officer in August 2007 but did not know whether he was on the date of the Guadalajara incident. He testified that Verner was also at some point an auxiliary Berwyn police officer but did not recall when.

¶ 44      Cicero police detective Eddie Perez testified that, while on duty at 1:30 a.m. on April 19, 2008, he responded to a call regarding a battery at the San Marcos tavern. He identified Davis in the hearing room and stated that Davis was the victim of the battery. Perez testified that, during the course of his investigation, Davis told him that Davis was a Cook County correctional officer and "was outside the lounge working off-duty detail and an individual tried to sneak into the bar which [Davis] stopped him." He stated Davis was wearing plain clothes, did not display a star or police identification and was not carrying a weapon or radio. Perez spoke with the restaurant owner but did not ask him whether Davis was working security. Perez identified a "Victim's Refusal to Sign Complaint" report, and stated that Davis had signed the form because he did not want to sign a complaint against the two alleged perpetrators of the battery. The form was admitted into evidence. Prepared by Perez on April 19, 2008, and signed by Davis, it identified Davis as the complaining witness and/or victim and reported that he "[did] not wish to prosecute *** for the offense of criminal trespass and battery and will not sign a complaint." The report further stated Davis requested that no action be taken because he "[did] not wish to press charges in behalf of San Marcos [*sic*] wish for individual to band [*sic*] off the property.

¶ 45      Following Detective Perez's testimony, the Sheriff rested his case. The parties stipulated that the OPR investigation was initiated on March 21, 2008, and completed on January 21, 2009. Plaintiffs did not call any witnesses and the defense rested.

¶ 46      On January 27, 2010, the Board issued its decisions, finding plaintiffs violated assorted rules, regulations and general orders. It issued seven decisions, one for each officer. Each decision contains (1) a "background" section synopsizing the allegations in the complaint; (2) the Board's "findings of fact," which are essentially recitations of the evidence presented at the hearing; and (3) a "resolution" section in which the Board stated:

> "Based on the evidence presented and after assessing the credibility of the witness [*sic*] and the weight to be given the evidence in the record, the Board finds respondent did violate the following [litany of the rules, regulations, DOC general orders and Sheriff's orders the particular officer violated]."

The decisions contain no analysis applying the findings of fact to the charges.

¶ 47      In the Roman decision, the Board listed the following findings of fact:

> Holmes testified:
>> –he knew Roman and knew that he worked at La Quinta,
>> –he identified Roman at the hearing,
>> –he did not personally recruit, schedule or pay Roman to work at La Quinta but
> knew of his employment from Tinoco,
>> –he had seen Roman at La Quinta on a few occasions, and
>> –he had worked with Roman there "a few times."
> In Roman's statement to OPR Investigator Shilling, Roman acknowledged:
>> –working at La Quinta,
>> –working as an auxiliary Berwyn police officer,
>> –not submitting a secondary employment request in 2007 or 2008, and

–wearing his badge around his neck, backwards and inside his shirt.

Officer Briggs testified:

–he knew Roman as an auxiliary Berwyn police officer, and

–he identified Roman at the hearing.

As of December 2008, Roman had no record of discipline in the prior 12 to 18 months.

¶ 48 In the Herrera decision, the Board listed the following findings of fact:

Holmes testified:

–he knew Herrera and knew that he worked at Tapas,

–he identified Herrera at the hearing,

–he did not personally recruit, schedule or pay Herrera to work at Tapas but knew of his employment from Tinoco,

–he had seen Herrera at Tapas on a few occasions, and

–he was at Tapas on December 30, 2007, when Herrera was involved in an altercation.

In Herrera's statement to OPR Investigator Shilling, he acknowledged:

–working at Tapas,

–while working at Tapas, he was "jumped" by four Tapas patrons on December 30, 2007,

–he signed criminal complaints against the patrons,

–he did not appear in court because he was never notified of the court date,

–he did not notify anyone from the Sheriff's Department about the incident,

–he did not submit a secondary employment request in 2007, and

–he stopped working security after the December 2007 incident.

As of December 2008, Herrera had no record of discipline in the prior 12 to 18 months.

¶ 49 In the DeSena decision, the Board stated the following findings of fact:

Holmes testified:

–he knew DeSena and knew that he worked at Tapas,

–he identified DeSena at the hearing,

–he did not personally recruit, schedule or pay DeSena to work at Tapas but knew of his employment from Tinoco, and

–he had seen DeSena in Tapas on a few occasions "helping the DJ" while wearing a sweatshirt with the DJ's logo.

In DeSena's statement to OPR Investigator Shilling, he acknowledged:

–working at Tapas and San Marcos,

–while working at San Marcos, wearing his badge "hanging from his neck where he always wears it,"

–not submitting a secondary employment request in 2007 or 2008, and

–stopping his secondary employment.

As of December 2008, DeSena had no record of discipline in the prior 12 to 18 months.

¶ 50 In the Verner decision, the Board stated the following findings of fact:

Holmes testified:

–he knew Verner and knew he worked at Guadalajara's,

–he identified Verner at the hearing,

–he did not personally recruit, schedule or pay Verner to work at Guadalajara's, but knew of his employment from Tinoco, and

–Verner did and did not [the Board noted the contradiction] collect money from bar owners to pay security workers.

In Verner's first statement to OPR Investigator Shilling, he:

–denied working security "at Guadalajara's or any other bars in Berwyn or Cicero,"

–stated he had no relationship with Holmes working as a security person in the bars or lounges in Berwyn and Cicero,

–stated he knew no other correctional officers or sheriff's employees employed at various locations in Berwyn and Cicero,

–stated he never submitted a secondary employment request because he did not work security, and

–stated the charges were politically and racially motivated.

In Verner's second statement to OPR Investigator Shilling, he:

–averred the veracity of his first statement,

–denied working at Guadalajara's on July 25, 2008, but acknowledged he might have been there that night,

–denied picking up money from bar owners to pay security workers,

–denied working security at Guadalajara's on August 25, 2008, but acknowledged he might have been there that night,

–denied any knowledge of Michael Pineda,

–stated he had no knowledge as to why the Berwyn police department had the wrong badge number for him, and

–restated his assertion that the charges were politically and racially motivated.

OPR Investigator Schroeder testified:

–he conducted surveillance at Guadalajara's on July 25, 2008, and saw two people standing at the bottom of the stairs to the second level "bar" checking patrons' identifications and

–the two people were Yerena and Verner, and

–a photograph Schroeder took of Yerena at Guadalajara's was entered into evidence.

Officer Spagnolo testified:

–he responded on August 25, 2007, at 1 a.m. to a call regarding a battery and theft at Guadalajara's,

–he spoke to three individuals at the scene wearing black shirts with "Police" on them in white letters; he believed they were working security,

–he believed two men who identified themselves as Verner and Cerami and gave him their badge numbers to be Cook County correctional officers, and

- 13 -

–he identified Verner at the hearing.[4]

Sergeant Briggs testified:

–he responded to the August 25, 2007, call to Guadalajara's,

–he saw three individuals in black shirts with "Police" on them who said they were working security, and

–he did not identify Verner at the hearing.[5]

¶ 51    In the Yerena decision, the Board made the following findings of fact:

Holmes testified:

–he knew Yerena and knew he worked at Guadalajara's,

–he identified Yerena at the hearing, and

–he did not personally recruit, schedule or pay Yerena to work at Guadalajara's, but knew of his employment from Tinoco.

In Yerena's statement to OPR Investigator Shilling, he:

–denied working security at Guadalajara's "or any other bars in Berwyn or Cicero."

OPR Investigator Schroeder testified:

–he conducted surveillance at Guadalajara's on July 25, 2008, and saw two people standing at the stairs to the second level "bar" checking patron's identification,

–he identified the two people as Yerena and Verner, and

–he took a photograph of Yerena that was entered into evidence.

¶ 52    In the Davis decision, the Board found as follows:

Holmes testified:

–he knew Davis and knew he worked at San Marcos,

–he identified Davis at the hearing, and

–he did not personally recruit, schedule or pay Davis to work at San Marcos, but knew of his employment from Tinoco.

In Davis's statement to OPR Investigator Shilling, he:

–denied working security at any bars in Berwyn or Cicero, "including San Marcos,"

–stated he had no relationship with Holmes,

–stated he does not remember an April 18-19, 2008, incident at San Marcos,

–acknowledged he did not submit a secondary employment request in 2007 or 2008, and

–acknowledged his signature on a Cicero police report "which indicates [him] as a security person at San Marcos and a Refusal to Prosecute, but does not remember the incident."

---

[4]This is an inaccurate reflection of Officer Spagnolo's testimony. Spagnolo did not identify Verner at the hearing. He testified that he could not identify any of the men present for the hearing as being "there that night."

[5]This is an inaccurate reflection of Sergeant Briggs's testimony. Briggs did identify Verner at the hearing.

Officer Perez testified:

–he responded to a battery call at "San Marcos tavern" at 1:30 a.m. on April 19, 2008,

–he identified Davis as the victim of the battery,

–he was told by Davis that he (Davis) was a Cook County correctional officer working an off-duty detail, and

–Davis signed the "Victim's Refusal to Sign Complaint" which was entered into evidence.

¶ 53    Finally, in the Cerami decision, the Board stated the following findings of fact:

Holmes testified:

–he knew Cerami and knew that he worked at Guadalajara's,

–he identified Cerami at the hearing, and

–he did not personally recruit Cerami but knew of Cerami's employment from Tinoco.

In Cerami's statement to OPR Investigator Shilling, he:

–acknowledged working at Guadalajara's three to six times a year,

–did not remember working on August 25, 2007,

–did not recall the incident on August 25, 2007, in which the Berwyn police were called,

–denied working security "at other bars in Berwyn and Cicero,"

–denied displaying his badge while working security,

–denied being armed while working security,

–admitted he did not file a secondary employment request in 2007 or 2008, and

–stated that he worked at Guadalajara's only "for the money" and regretted doing so.

Officer Spagnolo testified:

–he responded on August 25, 2007, at 1 a.m., to a call regarding a battery and theft at Guadalajara's,

–he spoke to three individuals at the scene wearing black shirts with "Police" on them in white letters; he believed they were working security,

–he believed the two men who identified themselves as Verner and Cerami and gave him their badge numbers to be Cook County correctional officers, and

–he did not identify Cerami at the hearing.

Sergeant Briggs testified:

–he responded to the August 25, 2007, call to Guadalajara's,

–he saw three individuals in black shirts with "Police" on them who said they were working security, and

–he did not identify Cerami at the hearing.

¶ 54    In each decision, after reciting Holmes's testimony regarding the particular officer, the Board noted its finding that "[i]n general, Holmes was not credible." It also stated that former and current Berwyn police officers Spagnolo and Briggs or "two members of the Berwyn Police Department" testified that, from approximately 10 p.m. until closing on Friday and Saturday nights, "the primary activity of the establishments in question was the sale of intoxicating liquor." In the Verner and Cerami decisions, the Board added that "[Spagnolo and Briggs] testified that there were frequent police calls to these establishments on Friday and

- 15 -

Saturday nights, from approximately 10:00 p.m. to closing."

¶ 55        Based on its findings of fact, the Board found plaintiffs violated the rules, regulations and general orders summarized in the following chart:

| Charge | Text of General Order, Rule or Regulation[6] | Board Found Violation by |
|---|---|---|
| DOC General order 3.8(III)(A)(1) | Employees will obey all federal, state, county and municipal laws | Verner |
| 3.8(III)(A)(4) | Employees will comply with lawful departmental rules, written procedures, directives, bulletins, and verbal orders issued by the proper authorities | All |
| 3.8(III)(A)(5) | Employees will respect and protect the civil and legal rights of all individuals | Verner |
| 3.8(III)(B)(16) | Sworn staff will not wear his/her uniform in bars, nightclubs or Establishments whose primary business includes the serving of alcoholic beverages | DeSena |
| 3.8(III)(B)(17) | Sworn employees will not work secondary employment in business entities whose primary business includes the serving of alcoholic beverages | All |
| 3.8(III)(D)(1) | Employees will refrain from the use of abusive or obscene language, threats, and coercion | None |
| 3.8(III)(D)(6) | Employees will maintain professional demeanor while on duty and will refrain from engaging in off-duty behavior that would reflect negatively on the department | Verner Davis Cerami |

_____

[6]The text of the general orders, Sheriff's orders and Board's rules and regulations is taken from the briefs and record.

| Charge | Text of General Order, Rule or Regulation | Board Found Violation by |
|---|---|---|
| 3.8(III)(G) | It shall be the responsibility of every employee to immediately report to their divisional Super-intendent/Unit Head and the department Internal Investigations Unit verbally and in writing, any fact or situation which may give rise to or be construed as corrupt, illegal or unethical behavior and/or a possible conflict of interest. This shall include, but not be limited to, reporting anything which could impair the employee's performance of their duties in a fair and impartial manner | DeSena Verner Davis Cerami |
| 3.17(III)(A) | A member wishing to engage in any outside employment (including self-employment) shall complete a secondary employment request form in an original along with three copies and submit all copes to the Director's office through the chain of command at least seven days prior to its intended effective date | All |
| 3.17(III)(B) | The requesting officer's Superintendent or Unit Supervisor shall review his request for secondary employment and shall indicate his approval or disapproval, sign and date the form. The signer shall then forward all copies, through the chain of command, to the Directors' officer. If the secondary employment involves any type of security work, an indemnity form must be signed by the employer and submitted with the secondary employment form | All |

| Charge | Text of General Order, Rule or Regulation | Board Found Violation by |
|---|---|---|
| 3.17(IV)(D) | A request for secondary employment shall be denied under any of the following conditions:<br><br>When the secondary employment is in an establishment where the primary business is the sale of intoxicating liquor or gambling. In no instance will a Department employee be permitted to be an owner of, or to serve as a bartender to dispense intoxicating liquor, or to serve as a cocktail waiter/waitress | All |
| 3.17(IV)(E) | A request for secondary employment shall be denied under any of the following conditions:<br><br>When the secondary employment or the place where it is performed, brings either the Department or the member into disrespect or disfavor, or involve the member in violations of Department rules and regulations, order or laws | All |
| 3.17(V)(A)(1) | The member shall ensure that his secondary employment request is accurate and up-to-date at all times | All |
| 4.1(III)(A)(5) | Guidelines for SERIOUS MISCONDUCT include, but are not limited to:<br>\*\*\*<br>[f]ailure to observe all Federal, State and local laws | Verner |
| 4.1(III)(A)(17) | Guidelines for SERIOUS MISCONDUCT include, but are not limited to:<br>\*\*\*<br>[e]ngage in any conduct unbecoming to an employee of the Cook County Department of Corrections which tends to reflect discredit on the Department of Corrections or Sheriff's Office | Verner<br>Davis<br>Cerami |

| Charge | Text of General Order, Rule or Regulation | Board Found Violation by |
|---|---|---|
| 4.1(III)(A)(18) | Guidelines for serious misconduct include, but are not limited to:<br><br>Making a false report, either oral or written | Verner Yerena Davis |
| Sheriff's Order 05-01(V)(A) | Prior to accepting or commencing any secondary employment, permission must be obtained through the chain of command from the Department Head. Applicants must complete a Secondary Employment Request form and submit the completed document to their immediate supervisor at least fourteen (14) days prior to the effective date of employment | All |
| 05-01(V)(B) | CCSO members applying for approval of secondary employment in any security, traffic control or law enforcement related employment shall, in addition to fulfilling all of the requirements pertaining to secondary employment, provide an Indemnity Agreement signed by the prospective employer and accompanied by proof of insurance or self-insurance, assuring performance of the Indemnity Agreement by such secondary employer. No security related secondary employment shall be approved or permitted under any circumstances until properly executed Indemnity Agreement and proof of insurance is received by the affected Department Head. An officer of the business or government agency authorized to enter into such an agreement must execute the Indemnity Agreement | All |

| Charge | Text of General Order, Rule or Regulation | Board Found Violation by |
|---|---|---|
| 05-01-(VI)(F)(1) | Secondary Employment is prohibited under the following conditions unless expressly authorized in writing by the appropriate Department Head or designee.<br><br>When the secondary employment is in an establishment where the primary business is the sale of intoxicating liquor or gambling and:<br><br>The employment is security related | |
| 05-01(VI)(F)(4) | Secondary Employment is prohibited under the following conditions unless expressly authorized in writing by the appropriate Department Head or designee.<br><br>When the secondary employment is in an establishment where the primary business is the sale of intoxicating liquor or gambling and:<br><br>The CCSO deems that the employment will bring discredit upon the department | All |
| Sheriff's Merit Board Rules & Regulations Art. X, par. B. 1 | No Police Officer of the Cook County Sheriff's Police Department, Correctional Officer of the Cook County Department of Corrections or Deputy Sheriff of the Cook County Sheriff's Court Services Department will:<br><br>violate any Law or Statute of any State or of the United States of America | Verner |

| Art. X, par. B. 3 | No Police Officer of the Cook County Sheriff's Police Department, Correctional Officer of the Cook County Department of Corrections or Deputy Sheriff of the Cook County Sheriff's Court Services Department will:<br><br>violate any of the general orders, special orders, directives, or rules and regulations of the Cook County Sheriff's Department | All |
| --- | --- | --- |

¶ 56    The Board suspended Roman and Herrera for 40 days, DeSena for 45 days and Cerami for 180 days, effective June 3, 2009. It ordered that Verner, Yerena and Davis be "separated" from employment with the DOC, effective June 3, 2009.

¶ 57    Plaintiffs filed complaints for administrative review of the Board's decisions in the circuit court of Cook County. Roman, Herrera and DeSena filed a joint action. The court did not consolidate the cases.

¶ 58    On November 4, 2011, the court issued orders in each of the five cases. In each decision, the court stated that, after reviewing the evidence, it found the Board's decision "that the officers were engaged in secondary employment at the respective bars without obtaining permission" was not against the manifest weight of the evidence. However, having reviewed the testimony of Holmes, Briggs and Spagnolo, the court agreed with plaintiffs' assertions that the Board's implied findings that the establishments' primary business was the sale of intoxicating beverages were against the manifest weight of the evidence. The court found "the testimony insufficient to support a finding as to each establishment." In each decision, the court went through the testimony in some detail and concluded that, although the testimony showed that overly intoxicated people were at the establishments, it did not show that the establishments were functioning primarily as bars during the time periods that the officers responded to calls at the bars. Nevertheless, the court found the suspensions and separations from employment were not arbitrary, unreasonable or unrelated to the needs of the Sheriff's department.

¶ 59    Plaintiffs moved to reconsider the court's decisions. They requested that the court remand the cases to the Board with directions for further proceedings consistent with the court's determinations that the Board's decisions finding the primary business of the establishments to be the service of alcohol were against the manifest weight of the evidence. Plaintiffs asserted that only the Board could determine the impact of the court's decision on the penalties imposed. The Sheriff responded that the evidence did support the Board's finding that the primary business of the establishments was the service of alcohol. It also pointed out that the court had not addressed the Board's finding that the primary business of the establishments "includes" the serving of alcohol, which was supported by the evidence. On February 8, 2012, the court issued an order in each case remanding the cases to the Board "in light of the Court's November 4, 2011[,] order for reconsideration of the penalty imposed."

¶ 60    At the Board's suggestion, the parties submitted written memoranda "in support of no or lesser penalties and requesting an evidentiary hearing" to the Board. On May 17, 2012, the Board issued a decision "on remand" in each of the seven cases. In each decision, it denied the

request to reopen the proofs. It stated that it had reviewed the record and the parties' submissions and determined that the original penalties were appropriate. In each case, the Board held:

> "The discipline imposed by the Cook County Sheriff's Merit Board in this cause was appropriate regardless of whether the Respondent was found to have been working at an establishment that was primarily serving alcohol. Ample evidence in the record supports the additional findings of violations of the general orders and rules and regulations set forth in the January 27, 2010[,] Merit Board decision that Respondent was engaged in secondary employment without approval from the Sheriff's office as required by the general orders [and] failed to obtain an indemnification form for secondary employment."

¶ 61    The Board further found "ample evidence" to support its earlier "additional findings of violations" that Roman and DeSena each "displayed his Cook County Sheriff's badge while engaged in secondary employment, Roman "gave a false report to [OPR] regarding his activities" and Herrera "failed to inform the Sheriff or appear in court in relation to an altercation that took place while engaged in secondary employment."[7]

¶ 62    It also found ample evidence to support its earlier findings of violations that Verner, Yerena and Davis each "failed to notify the Sheriff of an altercation that took place while he was working at the premises, and "gave a false report to the [OPR] regarding his activities," Verner and Yerena "failed to notify the Sheriff of being named in a civil suit [arising from the incident]" and Cerami "failed to notify the Sheriff of an altercation arising from his secondary employment, and failed to notify the Sheriff of being named in a civil suit arising from this employment."

¶ 63    Plaintiffs filed motions with the circuit court seeking review of the Board's decisions on remand. They asserted that the Board did not conduct a *bona fide* reconsideration of the penalties and, therefore, did not comply with the court's orders. On October 4, 2012, the court issued orders stating that it had reviewed the Board's decisions after remand and found that the Board's orders satisfied the court's February 2, 2012, remand order. The court affirmed the Board's decisions.

¶ 64    Plaintiffs timely appealed the court's orders. Roman, Herrera and DeSena filed a joint appeal, docketed by this court as appeal No. 1-12-3308. Verner's appeal is No. 1-12-3309, Yerena's is No. 1-12-3310, Davis's is No. 1-12-3311 and Cerami's is No. 1-12-3312. Each

---

[7]Contrary to the Board's statement that it had earlier decided that Roman committed a violation by displaying his badge while engaged in secondary employment, it had not made such a finding. In its original decisions, the Board found only DeSena violated general order 3.8(III)(B)(16) (sworn staff will not wear his/her uniform in bars, nightclubs or establishments whose primary business *includes* the serving of alcoholic beverages) for wearing his badge. No such finding was made against Roman.

Similarly, the Board had not made a previous finding that Roman committed a violation by giving a false report to OPR. The Board previously found only that Verner, Yerena and Davis had violated general order 4.1(III)(A)(18) (making a false report, oral or written), not Roman.

Lastly, the Board had not previously found that Herrera committed a violation by failing to inform the Sheriff of an altercation that took place while engaged in secondary employment. The Board previously found only that DeSena, Verner, Davis and Cerami violated general order 3.8(III)(G) (failure to report an incident).

appeal has been separately briefed, except that Verner, Cerami, Davis, Roman, Herrera and DeSena filed a joint reply brief. Yerena filed his own reply brief. We consolidated the five cases on appeal. Where necessary, we address separately any claims relating specifically to an individual plaintiff.

¶ 65                                                    ANALYSIS

¶ 66    In an administrative review case, we review the decision of the agency, not that of the circuit court. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531 (2006). We are limited to considering the evidence submitted in the administrative hearing and may not hear additional evidence for or against the agency's decision. *Marconi*, 225 Ill. 2d at 532. The standard of review we use to consider administrative decisions depends on the question presented. *Marconi*, 225 Ill. 2d at 532; *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). Under any standard of review, the burden of proof in an administrative proceeding lies with the plaintiff in the proceeding, here the Sheriff. *Marconi*, 225 Ill. 2d at 532-33.

¶ 67    We review an agency's purely factual determinations under the manifest weight of the evidence standard of review. *Marconi*, 225 Ill. 2d at 534. Under this standard, we take the agency's finding of fact as *prima facie* true and correct and will reverse a factual finding only if, after viewing the evidence in the light most favorable to the agency, we conclude that no rational trier of fact could have agreed with the agency's decision and an opposite conclusion is clearly evident. *Marconi*, 225 Ill. 2d at 534; *S.W. v. Department of Children & Family Services*, 276 Ill. App. 3d 672, 681 (1995); *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). We will not reverse an agency's finding of fact merely because an opposite conclusion might be reasonable or we might have ruled differently. *Marconi*, 225 Ill. 2d at 534. If the record contains evidence to support the agency's decision, we must affirm that decision. *Marconi*, 225 Ill. 2d at 534.

¶ 68    Although we afford considerable weight to an agency's factual and credibility determinations, nonetheless " '[e]ven under the manifest weight standard applicable in this instance, the deference we afford the administrative agency's decision is not boundless.' " *Kouzoukas v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 234 Ill. 2d 446, 465 (2009) (quoting *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 507 (2007)).

> "[O]ur review cannot amount to a rubber stamp of the proceedings below merely because the Board heard witnesses, reviewed records, and made the requisite findings. [Citations.] Even when the decision is supported by some evidence, which if undisputed would sustain the administrative finding, it is not sufficient if upon a consideration of all the evidence the finding is against the manifest weight." *Bowlin v. Murphysboro Firefighters Pension Board of Trustees*, 368 Ill. App. 3d 205, 211-12 (2006).

"When reviewing an administrative agency's decision, we may put aside any findings which are clearly against the manifest weight of the evidence." *Kouzoukas*, 234 Ill. 2d at 465.

¶ 69    We review strict questions of law *de novo*. *Branson v. Department of Revenue*, 168 Ill. 2d 247, 254 (1995). Under the *de novo* standard, we afford little or no deference to the agency's ruling. *Branson*, 168 Ill. 2d at 254.

- 23 -

¶ 70    We review mixed questions of law and fact, questions that require the interpretation of an ordinance, statute, rule or regulation and application of disputed facts to that interpretation, under the clearly erroneous standard. *Marconi*, 225 Ill. 2d at 532; *Rose v. Board of Trustees of the Mount Prospect Police Pension Fund*, 2011 IL App (1st) 102157, ¶ 69. Under this standard, we afford some deference to the agency's experience and expertise and must accept the agency's findings unless, after reviewing the record, we are left with the " 'definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 391-95 (2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). We limit our review to "determining whether the board's interpretation of its own rules had a reasonable basis in law." *Schlobohm v. Rice*, 157 Ill. App. 3d 90, 93-94 (1987); *Cook County State's Attorney v. Illinois State Labor Relations Board*, 292 Ill. App. 3d 1, 6 (1997). Although this standard is largely deferential, it does not require a reviewing court to "blindly defer to the agency's decision." *AFM Messenger*, 198 Ill. 2d at 395.

¶ 71    To determine the standard of review, we look at the questions presented. Plaintiffs present the following three arguments: (I) the Board's decision making procedures violated the Illinois Administrative Procedure Act and are inadequate for our review, (II) the Board's findings of fact were against the manifest weight of the evidence and (III) the disciplinary suspensions and terminations imposed on plaintiffs were arbitrary and capricious.

¶ 72                              I. Board's Decision Making Procedures

¶ 73    Plaintiffs argue that the Board's decisions are void, or alternatively, should be remanded with directions, because (A) the Board's decision making procedures violated the Illinois Administrative Procedure Act (5 ILCS 100/1-1 *et seq.* (West 2008)) and (B) the Board's decisions are otherwise so vague as to make judicial review unreasonably difficult. There being no disputed facts regarding these issues, we review the questions of law *de novo*.

¶ 74                              A. Illinois Administrative Procedure Act

¶ 75    Plaintiffs argue that the Board's decision making procedures violate the Illinois Administrative Procedure Act (5 ILCS 100/1-1 *et seq.* (West 2008)) and are, therefore, void. Specifically, they complain that, in violation of the Illinois Administrative Procedure Act, the Board's decisions failed to "include findings of fact and conclusions of law, separately stated" (5 ILCS 100/10-50(a) (West 2008)) and that "[f]indings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings" (5 ILCS 100/10-50(a) (West 2008)). However, the actual language of the Illinois Administrative Procedure Act establishes that it does not apply to the Board's decision making procedures.

¶ 76    By its own terms, the Illinois Administrative Procedure Act applies to every "agency" as defined therein. *Gounaris v. City of Chicago*, 321 Ill. App. 3d 487, 494 (2001); 5 ILCS 100/1-5 (West 2008). It defines "agency" in relevant part as follows:

          "each officer, board, commission, and agency created by the Constitution, whether in the executive, legislative, or judicial branch of State government, but other than the circuit court; each officer, department, board, commission, agency, institution, authority, university, and body politic and corporate of the State; each administrative unit or corporate outgrowth of the State government that is created by or pursuant to

- 24 -

statute, other than units of local government and their officers, school districts, and boards of election commissioners; and each administrative unit or corporate outgrowth of the above and as may be created by executive order of the Governor." 5 ILCS 100/1-20 (West 2008).

¶ 77   The Board does not meet this definition of "agency." First, it was not created by the state constitution. Instead, it was created by section 3-7002 of the Counties Code (55 ILCS 5/3-7002 (West 2008)).

¶ 78   Second, the Board is not a "body politic and corporate of the State," a legislatively created "administrative unit or corporate outgrowth of the State government" created pursuant to statute, or an "administrative unit or corporate outgrowth of the above and as may be created by executive order of the Governor." 5 ILCS 100/1-20 (West 2008). Instead, it is an agency of a unit of local government, specifically of the Cook County Sheriff. The Board's jurisdiction is limited to issues regarding deputy sheriffs in the Cook County police department, employees of the county department of corrections and full-time deputy sheriffs not employed as county police or county corrections officers.[8] 55 ILCS 5/3-7002 to 3-7012 (West 2008). For example, the Board is to promulgate rules and regulations governing employee conduct, establish a classification of ranks for these employees, set standards for each rank, propose a range of compensation to the Cook County board of commissioners, make certifications for promotions and prescribe disciplinary measures as punishment of infractions of the rules and regulations. 55 ILCS 5/3-7002 to 3-7012 (West 2008). The Board is clearly an agency of a unit of county government, not of the State.

¶ 79   As the Board is an agency of local government, not state government, it does not meet the definition of "agency" under the Illinois Administrative Procedure Act. In fact, the Illinois Administrative Procedure Act specifically excludes "*units of local government and their officers*" from its purview. (Emphasis added.) 5 ILCS 100/1-20 (West 2008). Since the Board is not an "agency" under the Illinois Administrative Procedure Act, the act's provisions do not apply to the Board. See *Gounaris*, 321 Ill. App. 3d at 494 (Illinois Administrative Procedure Act does not apply to proceedings before the Local Liquor Control Commission of the City of Chicago because commission is a unit of local government within the meaning of the Illinois Administrative Procedure Act, with its jurisdiction "strictly local and *** limited to the corporate boundaries of the City of Chicago"); *Carver v. Nall*, 186 Ill. 2d 554, 561-62 (1999) (Illinois Administrative Procedure Act does not apply to Adams County sheriff's merit commission because commission was created by county board rather than legislature, thereby making it an agency of county and not state), *overruled on other grounds*, *Nudell v. Forest Preserve District*, 207 Ill. 2d 409 (2003); *Guse v. Board of Trustees of the Public School Teachers' Pension & Retirement Fund*, 203 Ill. App. 3d 111, 115 (1990) (Illinois Administrative Procedure Act does not apply to the Board of Trustees of the Public School Teachers' Pension and Retirement Fund of Chicago because board was not created by constitution and is separate and apart from state government); *Bethune v. Larson*, 188 Ill. App. 3d 163, 170 (1989) (Illinois Administrative Procedure Act does not apply to Montgomery County board of health because board "is an agency of a unit of local government" and "not an

_____

[8]"Although the term 'jurisdiction' is not strictly applicable to an administrative body, it is used to designate the authority of the administrative body to act." *Armstead v. Sheahan*, 298 Ill. App. 3d 892, 894-95 (1998).

'agency' of the State"; therefore, cannot be "an 'agency' " as defined by the Illinois Administrative Procedure Act). Given that the provisions of the Illinois Administrative Procedure Act do not apply to the Board, the Board's failure to comply with those provisions cannot serve to invalidate its decisions.

¶ 80                                    B. Meaningful Judicial Review

¶ 81        Citing *Medina Nursing Center, Inc. v. Health Facilities & Services Review Board*, 2013 IL App (4th) 120554, plaintiffs argue alternatively that remand is warranted because the Board's decisions are so vague as to make judicial review unreasonably difficult. In *Medina*, the court remanded to the defendant agency, the Health Facilities and Services Review Board (Review Board), finding it could not conduct a meaningful review of the agency's decision because the agency had stated few findings of fact and did not adequately explain its decision. *Medina Nursing Center, Inc.*, 2013 IL App (4th) 120554, ¶ 27. Stating that administrative agencies are to "adequately *** articulate the bases of their action, showing a rational connection between the facts found and the choice made," the court "decline[d] to supply a theoretical justification of the [Review] Board's decision, even at the invitation of the [Review] Board's attorneys." (Internal quotation marks omitted.) *Id.* ¶¶ 24, 26. It explained, "[w]e provide reasons for *our* decisions, a salutary practice that not only helps the public to have confidence in what we do but also guards against arbitrariness. *** Likewise, the [Review] Board should provide reasons for its decisions." (Emphasis in original.) *Id.* ¶ 27. In order that "the [Review] Board issue a reasoned opinion so as to make possible a meaningful judicial review," the court remanded to the Review Board "with directions that the [Review] Board provide, in writing, a reasoned explanation for its decision in this case, complete with 'findings and conclusions.' " *Id.* (quoting 735 ILCS 5/3-110 (West 2010)).

¶ 82        We agree with the *Medina* court that an agency should adequately articulate the bases for its action, showing a rational connection between the facts found and the choice made, in order that we may conduct a meaningful review of the issues. We also agree with plaintiffs that the Board's decisions are inadequate for our review of some of the issues. Plaintiffs assert the decisions are "vague." Given that the Board failed to provide any analysis or explanation whatsoever in its initial decisions, let alone one adequately articulating the bases for their action, "vague" is too kind a word.

¶ 83        Nevertheless, we decline to remand to the Board and further prolong this litigation. The Board did provide some small amount of analysis in its decisions on remand. Therefore, we will lay any inadequacy of the Board's decisions squarely where it belongs by holding those inadequacies against the Board. We recognize that, as noted above, when applying the manifest weight of the evidence standard of review, we must view the evidence in the light most favorable to the agency. Nevertheless, if, due to the inadequacy of the Board's decisions that evidence is unclear, we will hold it against the Board.

¶ 84        As a result, we will not consider any of Holmes's testimony regarding plaintiffs' secondary employment. In each original decision, the Board listed Holmes's testimony relevant to the particular officer under review but then stated, without explanation, "[i]n general, Holmes was not credible." Presumably, given this credibility determination, the Board disregarded some or most of Holmes's testimony. Credibility determinations are for the Board to determine and we will defer to the Board's determinations. *Kouzoukas*, 234 Ill. 2d at 465. However, that deference is not boundless. *Id.* Here, the Board did not elucidate what it did or did not believe

of Holmes's testimony. Therefore, although we are prepared to defer to the Board's credibility findings, we do not know what those findings are regarding Holmes's testimony. Due to the inadequacy of the Board's decisions, we cannot know how much of Holmes's testimony the Board considered in making its decisions and will, therefore, disregard all of his testimony except as it relates to Holmes himself and the discipline imposed on him as a result of his "security" business.

¶ 85    We will address any other inadequacies in the Board's decisions as they arise below.

¶ 86                                    II. Board's Finding of Fact

¶ 87    Plaintiffs next argue that the Board's findings of fact were against the manifest weight of the evidence. Plaintiffs each raise numerous issues, often overlapping in content. We have consolidated the issues into four main categories: (A) the admissibility of the OPR statements, (B) the Board's findings regarding the nature of the establishments in which plaintiffs allegedly worked, (C) Holmes's alleged verbal approval of plaintiffs' secondary employment and (D) the violations found against each officer, within which section we will address the charges against each officer separately.

¶ 88                              A. Admissibility of OPR Statements

¶ 89    Plaintiffs argue that their statements to the Office of Professional Review investigators (OPR statements) were taken in violation of the Uniform Peace Officers' Disciplinary Act (50 ILCS 725/1 *et seq.* (West 2008)) (the Act) and, therefore, should not be permitted into evidence. Any admissions or confessions obtained from an officer during the course of an interrogation not conducted in accordance with the Act cannot be used in any subsequent disciplinary proceeding against the officer. 50 ILCS 725/3.10 (West 2008). Therefore, if the Act applies to plaintiffs and the OPR investigators did not comply with the Act in taking plaintiffs' statement, the statements cannot come into evidence before the Board. We find that the Act does apply to plaintiffs but that the investigators complied with the provisions of the Act.

¶ 90    Section 2 of the Act defines "officer" as follows:

> "For the purposes of this Act, unless clearly required otherwise, the terms defined in this Section have the meaning ascribed herein:
>
>     (a) 'Officer' means any peace officer, *as defined by Section 2-13 of the Criminal Code of 1961, as now or hereafter amended*, who is employed by any unit of local government or a State college or university, including supervisory and command personnel, and any pay-grade investigator for the Secretary of State as defined in Section 14-110 of the Illinois Pension Code, including Secretary of State sergeants, lieutenants, commanders, and investigator trainees. The term does not include crossing guards, parking enforcement personnel, traffic wardens or employees of any State's Attorney's office." (Emphasis added.) 50 ILCS 725/2 (West 2008).

In relevant part, section 2-13 of the Criminal Code of 1961 (720 ILCS 5/2-13 (West 2008)) (the Code) defines "peace officer" as follows:

> " 'Peace officer' means (i) any person who by virtue of his office or public employment is vested by law with a duty to maintain public order or to make arrests for offenses,

whether that duty extends to all offenses or is limited to specific offenses, or (ii) any person who, by statute, is granted and authorized to exercise powers similar to those conferred upon any peace officer employed by a law enforcement agency of this State." 720 ILCS 5/2-13 (West 2008).

¶ 91 Citing *Kelley v. Sheriff's Merit Comm'n*, 372 Ill. App. 3d 931, 932 (2007), the Sheriff argues that the Act does not apply to correctional officers because they are not peace officers. In *Kelley*, the plaintiff, a Kane County corrections officer, was suspended without pay for 120 days for insubordination because she refused to comply with a superior officer's order that she submit to a polygraph examination. She had argued to the Sheriff's Merit Commission of Kane County that she was entitled to the protection of section 3.11 of the Act, which prohibits use of a polygraph test without the officer's written consent. Noting that the provision applied only to "peace officers" within the meaning of section 2-13 of the Criminal Code of 1961, the court stated, without further comment or analysis, that the "[p]laintiff's duties as a corrections officer do not accord her the status of a peace officer." *Kelley*, 372 Ill. App. 3d at 932. We do not find *Kelley* dispositive. First, *Kelley* is addressed to the status of Kane County sheriff's correctional officers, not Cook County correctional officers. Second, *Kelley* provides no explanation whatsoever for its determination that the plaintiff correctional officer was not a peace officer. Accordingly, we accord *Kelley* no weight.

¶ 92 In order to show that they are peace officers covered by the Act, plaintiffs request that we take judicial notice of section 15.1 of the collective bargaining agreement between the Sheriff of Cook County and Teamsters Local 700, which provides in part:

> "The Employer shall not take any disciplinary action against an employee without cause. Employees who are to be or may be disciplined are entitled to Representation and rights consistent with the Illinois Uniform Peace Officers' Disciplinary Act 'Illinois Police Officer's Bill of Rights', as amended from time to time in the Illinois Compiled Statutes."

Pursuant to the agreement, the Sheriff agreed to be bound by the provisions of the Act. The Board is an agency of the Sheriff and also bound by the provisions of the Act. The Act, therefore, applies to protect plaintiffs in proceedings before the Board.

¶ 93 Further, the Sheriff's general orders show that, just like police officers, Cook County correctional officers have arrest powers (general order 3.24(III)(A)(F)), have a duty to protect the public from unlawful activity (general order 3.8(III)(B)(4)), and are considered "peace officers" by the Sheriff (general order 9.16, which sets forth the Sheriff's policy, guidelines and procedure for use of force by a "Peace Officer," and general order 3.14(II)(A), which defines "deputized" as "[a]ll sworn members that hold a Peace Officer status within the department and are authorized to carry a weapon having completed the Firearms Training Course")). Accordingly, correctional officers are peace officers as defined in the Act and the Act, therefore, affords plaintiffs the protections of the Act.

¶ 94 Given that the Act applies, the question then becomes whether, as plaintiffs argue, OPR investigators failed to comply with the requirements of the Act when they obtained plaintiffs' statements. "Admissions or confessions obtained during the course of any interrogation not conducted in accordance with this Act may not be utilized in any subsequent disciplinary proceeding against the officer." 50 ILCS 725/3.10 (West 2008). Therefore, if the OPR investigators did not comply with the Act, the statements they obtained from plaintiffs should not have come into evidence before the Board.

- 28 -

¶ 95    The Act provides that, "[w]henever an officer is subjected to an interrogation within the meaning of this Act, the interrogation shall be conducted pursuant to Sections 3.1 through 3.11 of this Act." 50 ILCS 725/3 (West 2008). It defines "interrogation" as follows:

> " 'Interrogation' means the questioning of an officer pursuant to the formal investigation procedures of the respective State agency or local governmental unit in connection with an alleged violation of such agency's or unit's rules which may be the basis for filing charges seeking his or her suspension, removal, or discharge. The term does not include questioning (1) as part of an informal inquiry or (2) relating to minor infractions of agency rules which may be noted on the officer's record but which may not in themselves result in removal, discharge or suspension in excess of 3 days." 50 ILCS 725/2(d) (West 2008).

There is no dispute that Shilling's interviews with plaintiffs were such interrogations.

¶ 96    Plaintiffs argue that the interrogations violate section 3.2 of the Act, which provides:

> "No officer shall be subjected to interrogation without first being informed in writing of the nature of the investigation. If an administrative proceeding is instituted, the officer shall be informed beforehand of the names of all complainants. The information shall be sufficient as to reasonably apprise the officer of the nature of the investigation." 50 ILCS 725/3.2 (West 2008).

They also assert the interrogations violated section 3.8(b), which provides:

> "Anyone filing a complaint against a sworn peace officer must have the complaint supported by a sworn affidavit." 50 ILCS 725/3.8(b) (West 2008).

¶ 97    Plaintiffs assert that, although OPR received a "complaint register" signed by Berwyn police department Chief Kushner against two correctional officers (as shown by Investigator Shilling's testimony), administrative charges were filed against nine officers, including the seven plaintiffs here. They assert there is, therefore, no evidence that complaints were filed against plaintiffs, that plaintiffs were told the names of any complainants against them (as required by section 3.2), that any complaint filed was supported by sworn affidavit (as required by section 3.8(b)) or even that Chief Kushner filed two affidavits.

¶ 98    Sections 3.2 and 3.8 do not apply to the complaints at issue here. Although Chief Kushner's "complaint register" brought possible misconduct by correctional officers to the Sheriff's attention, the charges brought herein resulted from the Sheriff's internal investigation. As a result of that investigation, the Sheriff then filed the complaints against plaintiffs. The Sheriff, not Kushner or any other third party, filed the complaints. Therefore, we find that sections 3.2 and 3.8 do not apply to the complaints at issue here.

¶ 99    Plaintiffs also argue that, in violation of section 3.2 of the Act, OPR's notices of the allegations could not reasonably apprise anyone of the subject matter of the investigation, because plaintiffs' signed statements merely state: "THIS STATEMENT IS RELATIVE TO: Conduct Unbecoming a Correctional Officer[,] Unauthorized Secondary Employment[,] Failure to notify the Proper Authority" and list the dates of occurrence as "2007-2008." They assert this notice includes nothing regarding the wearing of badges while at the disputed establishments, being in altercations, working as auxiliary police officers and working security in places primarily serving alcohol. They argue the written allegation on the statements is too vague to have any meaning whatsoever, let alone sufficient to "reasonably apprise the officer of the nature of the investigation" as required by section 3.2 of the Act.

¶ 100    We find plaintiffs were sufficiently informed of the charges against them to comply with section 3.2. The notification at the top of each of the OPR statements notified plaintiffs that the investigations concerned alleged conduct unbecoming a correctional officer, unauthorized secondary employment and failure to notify the proper authority. The statements reasonably apprised plaintiffs of the major charges against them and, therefore, of the nature of the investigations. A guilty finding on any of these charges, standing alone, would provide a sufficient basis for suspension of their employment. Further, in plaintiffs' respective signed statements, each acknowledged receiving a "notification of allegations form." Asked during oral argument before this court regarding these forms, plaintiffs were unable to explain how the "notification of allegations" forms were deficient in notifying plaintiffs of the nature of the investigations. Accordingly, we find that the information plaintiffs received was sufficient to reasonably apprise them of the nature of the investigation in compliance with section 3.2 of the Act.

¶ 101    The interrogations did not violate the requirements of the Act and the OPR statements were, therefore, properly before the Board.

¶ 102                                    B. Nature of the Establishments

¶ 103    Plaintiffs argue that no evidence established the nature of the establishments at which plaintiffs were accused of working, specifically that no evidence supports the Board's implied findings that the "primary business" of the establishments "is the sale of intoxicating liquor" (used in general order 3.17(IV)(D) and Sheriff's orders 05-01(VI)(F)(1) and 05-01(VI)(F)(4)) or "includes the serving of alcoholic beverages" (used in general orders 3.8(III)(B)(16) and 3.8(III)(B)(17)).[9] We would review these questions of fact under the manifest weight of the evidence standard.

¶ 104    However, the trial court agreed with plaintiffs that the Board's implied findings that the primary business of the establishments is the sale of intoxicating liquor were against the manifest weight of the evidence, noting that it found "the testimony insufficient to support a finding as to each establishment." It vacated those findings and remanded to the Board for reconsideration of the suspensions and terminations in light of the court's decision. Ultimately, after remand, the trial court entered a final order affirming the Board's decisions on remand, which retained the original suspensions and terminations.

¶ 105    At that point, the court's decisions regarding the Board's findings became final and appealable. However, the Sheriff did not appeal the court's holdings that the Board's findings that the primary business of the establishments is the sale of intoxicating liquor were against the manifest weight of the evidence. Accordingly, we have no jurisdiction to consider a challenge to these findings and they stand.[10]

_____

[9]The Board made no specific findings regarding the nature of the establishments. However, given that the Board found plaintiffs committed violations of the orders prohibiting secondary employment in establishments that either primarily sell intoxicating beverages or include the serving of alcoholic beverages in their primary business, the Board necessarily must have found that the establishments meet those qualifications.

[10]The court's determination that the Board's findings regarding the primary business of the establishments being the sale of intoxicating liquor were against the manifest weight necessarily

¶ 106    The trial court, however, did not address whether the Board's implied findings that the primary business of the establishments "includes the serving of alcoholic beverages" (as used in general orders 3.8(III)(B)(16) and (B)(17)) were against the manifest weight of the evidence. Addressing this question, we find that the evidence supports such findings. Copies of the business licenses for the various establishments show that the establishments are restaurants licensed to serve liquor and the testimony of Holmes and Officers Spagnolo and Briggs supports finding that the primary business of the establishments actually did include the serving of alcoholic beverages. The Board's findings that the establishments' primary business includes the serving of alcoholic beverages were not against the manifest weight of the evidence. We will address the relevance of this determination below, as pertinent to each individual officer.

¶ 107              C. Failure to File Secondary Employment Request and Indemnity Forms

¶ 108    The Board found plaintiffs violated assorted DOC general orders and Sheriff's orders requiring an employee wishing to work secondary employment to (a) submit a secondary employment request in order to obtain approval for the secondary employment and (b) if working security, submit an indemnity form with the secondary employment request. Plaintiffs argue that, assuming *arguendo* that they were working security as secondary employment, their employment was approved by the Sheriff through the actions of then-superintendent Michael Holmes and they were, therefore, excused from submitting secondary employment request and indemnity forms. Even assuming *arguendo* that Holmes had given plaintiffs verbal permission to work secondary employment, they were not excused from complying with the requirements of the DOC general orders and Sheriff's orders.

¶ 109    The general orders and Sheriff's orders set forth very specific requirements for obtaining approval for secondary employment. Pursuant to general order 3.17(III)(A), an officer wishing to engage in secondary employment must complete a secondary employment request form and submit the original plus three copies "to the Director's office through the chain of command." Under general order 3.17(III)(B), a superintendent or supervisor must approve and sign the secondary employment request and then forward it to the director's office. It also requires that, if the secondary employment "involves any type of security work," the officer must submit an indemnity form signed by the secondary employer along with the secondary employment request form. Lastly, general order 3.17(V)(A)(1) requires that the officer must ensure his or her secondary employment request is accurate and up-to-date at all times. Sheriff's orders

---

encompassed finding that the Board's findings that plaintiffs violated the following orders and rules were against the manifest weight of the evidence:

    –DOC general order 3.17(IV)(D) (secondary employment prohibited in an establishment where the primary business is the sale of intoxicating liquor or gambling);

    –Sheriff's order 05-01(VI)(F)(1) (unless expressly authorized in writing by department head or designee, secondary employment prohibited in an establishment where the primary business is the sale of intoxicating liquor or gambling and employment is security related); and

    –Sheriff's order 05-01(VI)(F)(4) (unless expressly authorized in writing by department head or designee, secondary employment prohibited in an establishment where the primary business is the sale of intoxicating liquor or gambling and Sheriff's office deems the employment will bring discredit upon the department).

05-01(V)(A) and 05-01(V)(B) provide similarly, requiring that permission to work secondary employment be obtained "through the chain of command from the Department Head" through submission of a secondary employment request form to the officer's immediate supervisor and an indemnity agreement signed by the prospective employer and accompanied by proof of insurance or self-insurance must be provided if the request is for security related secondary employment.

¶ 110    The DOC general orders and Sheriff's orders plainly state that approval for secondary employment can only be obtained upon submission of a *written* secondary employment request and *written* approval by the officer's supervisor or department head, as appropriate. Further, if the secondary employment involves security work, such approval cannot be obtained unless an indemnity form signed by the secondary employer accompanies the secondary request. It is clear that plaintiffs did not obtain written approval from Holmes or anyone else for their secondary employment. Even if Holmes was plaintiffs' supervisor or department head and had verbally approved their secondary employment, such verbal approval would not meet the requirements of the DOC general orders and Sheriff's orders. Nothing in the DOC general orders and Sheriff's orders excuses an officer from complying with these requirements. Therefore, if the evidence supports the Board's findings that plaintiffs were working security as secondary employment, their failure to obtain written approval for that employment by filing secondary employment request and indemnity forms was in violation of the DOC general orders and Sheriff's orders.

¶ 111                              D. Individual Violations

¶ 112    We next consider whether the specific evidence against each officer supported the Board's ultimate conclusions regarding plaintiffs' violations of the DOC general orders, Sheriff's orders and Board rules and regulations. Taking into account our earlier determinations, we will disregard any of Holmes's testimony directed to plaintiffs' secondary employment but will consider plaintiffs' OPR statements, which were admitted through Investigator Shilling's testimony and properly before the Board. We now turn to the remaining violations found against each officer.

¶ 113                                    1. Roman

¶ 114    Roman admitted in his OPR statement that he worked security at La Quinta and had not submitted a secondary employment request. Given that Roman admitted working security and failing to submit a secondary employment request, he necessarily also did not submit the indemnity form that is to be submitted with the secondary request form when the secondary employment concerns security work. Roman's admissions support the Board's implied findings that Roman worked security as secondary employment without having submitted the requisite secondary employment request form and had no permission from his supervisors for the employment. These findings are not against the manifest weight of the evidence. Accordingly, we affirm the Board's findings that Roman violated the following general orders, order and regulations:

> –DOC general order 3.8(III)(A)(4) (failure to comply with lawful departmental rules, written procedures, directives),

–DOC general order 3.17(III)(A) (member wishing to engage in outside employment shall complete secondary employment request form and submit original plus three copies "to the Director's office through the chain of command"),

–DOC general order 3.17(III)(B) (superintendent or supervisor must approve and sign secondary employment request and forward to director's office; if secondary employment "involves any type of security work," officer must submit indemnity form signed by secondary employer with secondary employment request form),

–DOC general order 3.17(V)(A)(1) (officer must ensure secondary employment request is accurate and up-to-date at all times),

–Sheriff's order 05-01(V)(A) (permission to work secondary employment must be obtained "through the chain of command from the Department Head," through submission of secondary employment request form to immediate supervisor),

–Sheriff's order 05-01(V)(B) (request for approval of secondary employment in security, traffic control or law enforcement related employment must also provide indemnity agreement signed by prospective employer and accompanied by proof of insurance or self-insurance), and

–Sheriff's Merit Board Rules and Regulations article X, paragraph B. 3 (correctional officer will not "violate any of the general orders, special orders, directives, or rules and regulations of the Cook County Sheriff's Department").

¶ 115    Further, given our previous determination that the evidence supports the Board's implied finding that the primary business of the establishments "includes the serving of alcoholic beverages," we also affirm the Board's findings that Roman violated general order 3.8(III)(B)(17) (secondary employment prohibited in business entities whose primary business includes the serving of alcoholic beverages) and general order 3.17(IV)(E) (secondary employment prohibited when "the secondary employment or the place where it is performed, brings either the Department or the member into disrespect or disfavor, or involve the member in violations of Department rules and regulations, order or laws").

¶ 116                                    2. Herrera

¶ 117    Herrera's admissions in his OPR Statement that he worked security at Tapas checking IDs and did not submit a secondary employment request in 2007 support the Board's implied findings that Herrera worked security at Tapas as secondary employment in an establishment whose primary business includes the serving of alcoholic beverages, without having submitted the requisite secondary employment request form and indemnity form in order to secure permission from his department head. These findings are not against the manifest weight of the evidence. Accordingly, as with Roman, we affirm the Board's findings that Herrera violated DOC general orders 3.8(III)(A)(4), 3.8(III)(B)(17), 3.17(III)(A), 3.17(III)(B), 3.17(IV)(E), and 3.17(V)(A)(1); Sheriff's orders 05-01(V)(A) and 05-01(V)(B); and Sheriff's Merit Board Rules and Regulations article X, paragraph B. 3.

¶ 118                                    3. DeSena

¶ 119    DeSena's admissions in his OPR statement that he worked security at Tapas, San Marcos and other bars in Berwyn/Cicero and that he did not submit a secondary employment request in 2007 or 2008 support the Board's implied findings that he worked security as secondary

employment in establishments whose primary business includes the serving of alcoholic beverages, without having submitted the requisite secondary employment request form and indemnity form in order to secure permission from his department head. These findings are not against the manifest weight of the evidence. Accordingly, we affirm the Board's findings that DeSena violated DOC general orders 3.8(III)(A)(4), 3.8(III)(B)(17), 3.17(III)(A), 3.17(III)(B), 3.17(IV)(E), and 3.17(V)(A)(1); Sheriff's orders 05-01(V)(A) and 05-01(V)(B); and Sheriff's Merit Board Rules and Regulations article X, paragraph B. 3.

¶ 120    In his OPR statement, DeSena also admitted that he wore his badge while working security at the establishments. Given our earlier conclusion that the evidence supports the Board's finding that the establishments' primary business includes the serving of alcoholic beverages, we affirm the Board's finding that DeSena violated general order 3.8(III)(B)(16) (sworn staff will not wear his/her uniform in bars, nightclubs or establishments whose primary business includes the serving of alcoholic beverages).

¶ 121    The Board's finding that DeSena violated DOC general order 3.8(III)(G) (employee must immediately report to his divisional superintendent/unit head and the department Internal Investigations Unit "verbally and in writing, any fact or situation which may give rise to or be construed as corrupt, illegal or unethical behavior and/or a possible conflict of interest," including, "but not be limited to, reporting anything which could impair the employee's performance of their duties in a fair and impartial manner") is against the manifest weight of the evidence. DeSena admitted that he was at San Marcos on April 13, 2008, when Cicero police arrived but stated he was not involved in the incident. The parties do not mention the incident in the briefs and the Board does not mention it in its findings of fact. In fact, the Board's decision states no findings of fact that could arguably sustain finding this violation and our review of the evidence does not disclose any. Therefore, because we do not know what the incident was or whether it is relevant, we will assume the Board had no basis on which to find DeSena violated general order 3.8(III)(G) and vacate that finding.

¶ 122                                    4. Verner

¶ 123    In his OPR statements, Verner denied working security at the bars and restaurants in Berwyn and Cicero. He stated he had not filed a secondary request because he did not work security. Verner told Investigator Shilling that, although he might have been at Guadalajara's on July 25, 2008, and was there on August 25, 2008, with his wife, he was not working security there. Investigator Schroeder testified that he saw Verner at Guadalajara's on July 25, 2008, checking patron's identifications. But he also testified that he did not speak to Verner and that Verner was not wearing a shirt or other indicia to show that he was working as police or security. Standing alone, Schroeder's testimony is insufficient to show that Verner was working security as a secondary employment at Guadalajara's. Schroeder could have asked Verner what he was doing or asked the restaurant owner or manager whether Verner was working. He did neither and his testimony is, therefore, insufficient to show that Verner was working security as secondary employment.

¶ 124    However, Officers Spagnolo's and Briggs's testimony, taken together with Schroeder's testimony, is sufficient to support such a finding. Spagnolo and Briggs testified that Verner was at Guadalajara's on August 25, 2007, wearing a shirt with "police" on it and that Briggs was told, he thought by Verner, that the men were working security. While Spagnolo only testified that an individual identified himself as Verner and gave a badge number, Briggs

- 34 -

actually identified Verner at the hearing. Taken together, this testimony supports the Board's implied findings that Verner worked security at Guadalajara's as secondary employment in an establishment whose primary business includes the serving of alcoholic beverages, without having submitted the requisite secondary employment request form and indemnity form in order to secure permission from his department head. These findings are not against the manifest weight of the evidence. Accordingly, we affirm the Board's findings that he violated DOC general orders 3.8(III)(A)(4), 3.8(III)(B)(17), 3.17(III)(A), 3.17(III)(B), 3.17(IV)(E), and 3.17(V)(A)(1); Sheriff's orders 05-01(V)(A) and 05-01(V)(B); and Sheriff's Merit Board Rules and Regulations article X, paragraph B. 3.

¶ 125    In his OPR statement, Verner told Investigator Shilling that he did not work security at Guadalajara's. Given that the evidence supports a finding that Verner did work security at Guadalajara's as secondary employment, his statement to Shilling was false. Accordingly, the evidence supports the Board's finding that Verner violated general order 4.1(III)(A)(18) ("Guidelines for SERIOUS MISCONDUCT include, but are not limited to: Making a false report, either oral or written"). Therefore, we affirm this finding.

¶ 126    The Board also found Verner violated the following general orders and regulation:

–DOC general order 3.8(III)(A)(1) (employees will obey all federal, state, county and municipal laws),

–DOC general order 3.8(III)(A)(5) (employees will respect and protect the civil and legal rights of all individuals),

–DOC general order 3.8(III)(D)(6) (employees will maintain professional demeanor while on duty and will refrain from engaging in off-duty behavior that would reflect negatively on the department),

–DOC general order 4.1(III)(A)(5) (guidelines for serious misconduct include, but are not limited to: failure to observe all federal, state and local laws),

–DOC general order 4.1(III)(A)(17) (guidelines for serious misconduct include, but are not limited to: engage in any conduct unbecoming to an employee of the DOC which tends to reflect discredit on the DOC or Sheriff's office), and

–Sheriff's Merit Board Rules and Regulations, article X, paragraph B. 1 (Cook County corrections officers are prohibited from violating "any Law or Statute of any State or of the United States of America").

The only evidence in any way relevant to these charges is Pineda's federal complaint, in which he accused Verner of violating his civil rights and battery. However, there is no evidence to show that the charges were proven, that Verner actually violated the law by committing battery against Pineda or by violating Pineda's civil rights. Therefore, there is no evidence to support the Board's findings that Verner violated DOC general orders 3.8(III)(A)(1), 3.8(III)(A)(5), 3.8(III)(D)(6), 4.1(III)(A)(5) and 4.1(III)(A)(17) and article X, paragraph B. 1 of the Board's rules and regulations. We vacate these findings as against the manifest weight of the evidence.

¶ 127    We affirm the Board's finding that Verner violated DOC general order 3.8(III)(G), which requires employees to report, "verbally and in writing, any fact or situation which may give rise to or be construed as corrupt, illegal or unethical behavior and/or a possible conflict of interest. This shall include, but not be limited to, reporting anything which could impair the employee's performance of theft [*sic*] duties in a fair and impartial manner." The evidence shows that, on August 25, 2007, Guadalajara patron Pineda called police and reported that

Verner had committed theft and battery against him and that he wanted to file a complaint. Investigator Shilling searched the Sheriff's records to determine if Verner had made any report regarding Pineda's subsequent lawsuit related to the incident and found no such report, arguably because Verner had not been served with the lawsuit until after Shilling's interview.[11]

¶ 128   However, Verner was not only under an obligation to "immediately" report the lawsuit but also to "immediately" report the underlying incident. Regardless of his awareness of the filing of the lawsuit, Verner was aware that police were called to Guadalajara's on August 25, 2007, and that a citizen complained about his conduct. The incident was clearly a "situation which may give rise to or be construed as corrupt, illegal or unethical behavior" and Verner, therefore, should have "immediately" reported it to his supervisor and the Sheriff's internal investigations unit. Giving "immediately" its commonly understood meaning, it means that Verner should have reported the incident right away. Shilling interviewed Verner on September 19, 2008, and November 6, 2008, more than a year after the incident. Verner's failure to report the incident within a year's time was clearly a violation of the requirement that he report it immediately. The Board's finding that Verner violated general order 3.8(III)(G) is, therefore, not against the manifest weight of the evidence and we affirm the finding.

¶ 129                                  5. Yerena

¶ 130   The evidence is insufficient to support the Board's findings that Yerena violated any of the general orders, sheriff's orders or Board's rules and regulations. Given that we will not consider Holmes's testimony regarding any of the officers, the only evidence that might arguably support a finding that Yerena was working secondary employment is Investigator Schroeder's testimony that he saw Verner and Yerena checking patron's identifications for a half hour on July 25, 2008, at Guadalajara's. As noted above with regard to Verner, Schroeder's testimony standing alone does not support a finding that the men were working security as secondary employment. Schroeder did not verify with Yerena or anyone else that Yerena was, in fact, working, when he was checking the identifications and the photograph showing Yerena outside Guadalajara's does little to support a finding that he was working security there that night.

¶ 131   In his OPR statement, Yerena denied working security at Guadalajara's "or any other bars in Berwyn or Cicero" and denied working at Guadalajara's on July 25, 2008. At oral argument, his counsel posited the innocent explanation that he could have been volunteering for a private party on this one occasion. We will not cast about for all possible innocent explanations for Yerena's presence at Guadalajara's on that one night. The reason for his presence could easily have been determined by Investigator Shilling. In the face of Schroeder's observations and Yerena's statement to Shilling that he was not working at Guadalajara's on July 25, 2008, Shilling should have asked Yerena what he was doing there that night or why he was checking identifications. Inexplicably, he did not do so. Accordingly, there is no support for the Board's finding that Yerena committed the violations. The finding is against the manifest weight of the evidence and we, therefore, vacate all violations found against Yerena.

_____

[11]Shilling testified that he did not know whether Verner had been served with the lawsuit at the time of the interview. He had not. Shilling interviewed Verner on September 19, 2008, and November 6, 2008. Verner was served thereafter, on November 25, 2008.

¶ 132                                            6. Davis

¶ 133        Officer Perez's testimony and the "Victim's Refusal to Sign Complaint" are sufficient to support the Board's implied findings that Davis worked security at San Marcos. Perez testified that he responded to a battery call at "San Marcos tavern" at 1:30 a.m. on April 19, 2008, and identified Davis in the hearing as the victim of the battery. He stated that Davis had signed a "Victim's Refusal to Sign Complaint" form. In the form, prepared by Perez and signed by Davis, it identified Davis as the complaining witness and/or victim and reported that he "[did] not wish to prosecute *** for the offense of criminal trespass and battery and will not sign a complaint." The form further stated Davis requested that no action be taken because he "[did] not wish to press charges in [*sic*] behalf of San Marcos [*sic*] wish for individual to band [*sic*] off the property." Perez testified that he had not asked the bar owner whether Davis was working security but Davis had told him that he was a Cook County correctional officer and "was outside the lounge working off-duty detail" when he tried to stop someone from "sneaking in." We cannot interpret Davis's statement to Perez that he was working "off-duty" in any way other than that Davis was working a second job. Moreover, in his refusal to sign form, Davis specifically stated that he did not wish to press charges on "behalf of San Marco," in other words, that he represented San Marcos.

¶ 134        In Davis's OPR statement, he denied working security at any bars in Berwyn/Cicero, including San Marcos but acknowledged he did not submit a secondary employment request in 2007 or 2008. He stated he did not remember an April 18-19, 2008, incident at San Marcos when Cicero police responded but acknowledged his signature on the Cicero police report noting his refusal to prosecute, although he again stated that he did not remember the incident. Taken together, Perez's testimony, the "refusal to sign complaint" form and Davis's OPR statement are sufficient to support the Board's implied findings that Davis worked security at San Marcos as secondary employment in an establishment whose primary business includes the serving of alcoholic beverages, without having submitted the requisite secondary employment request form and indemnity form in order to secure permission from his department head. These findings are not against the manifest weight of the evidence. Accordingly, we affirm the Board's findings that he violated DOC general orders 3.8(III)(A)(4), 3.8(III)(B)(17), 3.17(III)(A), 3.17(III)(B), 3.17(IV)(E) and 3.17(V)(A)(1); Sheriff's orders 05-01(V)(A) and 05-01(V)(B); and Sheriff's Merit Board Rules and Regulations article X, paragraph B. 3.

¶ 135        Given that the evidence supports finding Davis worked security at San Marcos as secondary employment, his statement to Investigator Shilling that he did not work there was false. Accordingly, the evidence supports the Board's finding that Davis violated general order 4.1(III)(A)(18) by making the false statement and we affirm this finding.

¶ 136        The Board also found that Davis violated the following general orders:

          –DOC general order 3.8(III)(D)(6) (employees will maintain professional demeanor while on duty and will refrain from engaging in off-duty behavior that would reflect negatively on the department),

          –DOC general order 3.8(III)(G) (every employee must "immediately report to [their] divisional Superintendent/Unit Head and the department Internal Investigations Unit verbally and in writing, any fact or situation which may give rise to or be construed as corrupt, illegal or unethical behavior and/or a possible conflict of interest.

- 37 -

This shall include, but not be limited to, reporting anything which could impair the employee's performance of [their] duties in a fair and impartial manner"), and

–DOC general order 4.1(III)(A)(17) (guidelines for serious misconduct include, but are not limited to: engage in any conduct unbecoming to an employee of the DOC which tends to reflect discredit on the DOC or Sheriff's office).

Given the lack of analysis in the Board's decision, we presume that it based these findings on the evidence that Davis was the victim of a battery while working at San Marcos. It is the only evidence at all relevant to these violations. Without more, there is nothing to explain how being a battery *victim* reflects negatively or discredits the DOC or Sheriff's Office. Nothing explains how being a victim may give rise to or be construed as corrupt, illegal or unethical behavior and/or a possible conflict of interest or how the incident could impair Davis's performance of his duties in a fair and impartial manner. Accordingly, we find no support for the Board's findings that Davis violated DOC general order 3.8(III)(G) by failing to report the incident, engaged in conduct unbecoming in violation of general order 4.1(III)(A)(17) and engaged in off-duty behavior reflecting negatively on the DOC in violation of general order 3.8(III)(D)(6). These findings are against the manifest weight of the evidence. We, therefore, vacate the Board's findings that Davis violated DOC general orders 3.8(III)(G), 4.1(III)(A)(17) and 3.8(III)(D)(6).

¶ 137                                    7. Cerami

¶ 138        In his OPR statement, Cerami admitted working security at Guadalajara's three to six times in a year and that he did not file a secondary employment request in 2007 or 2008. Cerami's admissions are sufficient to support the Board's implied findings that Cerami worked security at Guadalajara's as secondary employment in an establishment whose primary business includes the serving of alcoholic beverages, without having submitted the requisite secondary employment request form and indemnity form in order to secure permission from his department head. As with Verner above, Officers Spagnolo's and Briggs's testimony that Cerami was at Guadalajara's on August 25, 2007, wearing a shirt with "police," that he identified himself to the officers and gave them a badge number and that Briggs was told the men were working security also support these findings. Accordingly, the Board's findings that Cerami violated DOC general orders 3.8(III)(A)(4), 3.8(III)(B)(17), 3.17(III)(A), 3.17(III)(B), 3.17(IV)(E) and 3.17(V)(A)(1); Sheriff's orders 05-01(V)(A) and 05-01(V)(B); and Sheriff's Merit Board Rules and Regulations article X, paragraph B. 3 are not against the manifest weight of the evidence and we affirm.

¶ 139        Pineda's federal complaint accused Cerami of violation of his civil rights and battery. However, as noted previously in regard to the Board's findings against Verner, no evidence shows that the charges in the complaint were proven and there is, therefore, no evidence to support the Board's finding that Cerami violated DOC general order 4.1(III)(A)(17). We vacate this finding as against the manifest weight of the evidence.

¶ 140        Given the lack of evidence that Cerami engaged in the charged behavior, we also vacate the Board's finding that Cerami violated DOC general order 3.8(III)(D)(6) (employees will refrain from engaging in off-duty behavior that would reflect negatively on the department).

¶ 141        As with Verner, the August 25, 2007, incident at Guadalajara's in which Pineda accused Cerami of theft and battery clearly gave rise to a situation that could "be construed as corrupt, illegal or unethical behavior." Cerami was aware that police had been called and that a citizen

had complained that Cerami had committed battery against him. Therefore, regardless of whether he was actually guilty of attacking Pineda, Cerami should have "immediately" reported the incident to the appropriate authorities pursuant to DOC general order 3.8(III)(G). Investigator Shilling's testimony shows that Cerami had not reported the incident as of the date of Shilling's interview with him on October 20, 2008, more than a year after the incident. Cerami's failure to report the incident within a year's time was clearly a violation of the requirement that he report it immediately. Accordingly, the Board's finding that Cerami violated general order 3.8(III)(G) is not against the manifest weight of the evidence and we affirm.

¶ 142                          III. Suspensions and Terminations

¶ 143    Having concluded our review of the Board's factual findings, we must now determine whether the findings provided a sufficient basis for the sanctions imposed by the Board. *Abrahamson*, 153 Ill. 2d at 99. A Sheriff's correctional officer may not "be removed, demoted or suspended except for cause, upon written charges filed with the Board by the Sheriff and a hearing before the Board thereon," where the officer has the right to present evidence and argument. 55 ILCS 5/3-7012 (West 2008). " 'Cause' is a substantial shortcoming that renders continuance in office detrimental to the discipline and efficiency of the service, or something that the law and sound public opinion recognize as good cause for no longer occupying office." *Malinowski v. Cook County Sheriff's Merit Board*, 395 Ill. App. 3d 317, 322 (2009). A reviewing court will defer to the agency's experience and expertise in determining what sanction is appropriate to protect the public interest. *Abrahamson*, 153 Ill. 2d at 99. We review the Board's findings that the officers' guilt was a sufficient cause for discharge and reverse only if its findings were arbitrary and unreasonable or was unrelated to the requirements of the service. *Malinowski*, 395 Ill. App. 3d at 322-23.

¶ 144    With regard to Roman, Herrera, DeSena and Cerami, it is their burden to establish that their suspensions were unwarranted, *i.e.*, that the Board's conclusions as to discipline were arbitrary, unreasonable or unrelated to the requirements of the service. *Calanca v. Board of Fire & Police Commissioners*, 140 Ill. App. 3d 408, 411 (1986); *Chambers v. Flota*, 191 Ill. App. 3d 603, 606 (1989).

¶ 145    Verner, Yerena and Davis must show similarly that their terminations were unwarranted. "It is axiomatic that an officer's violation of a single rule may constitute a sufficient basis for discharge." *Malinowski*, 395 Ill. App. 3d at 322. However, although an agency has broad discretion in determining what constitutes a proper cause for discharge, the discharge must be based upon substantial misconduct or incapacity which "does not include conduct which is so trivial as to be unreasonable and arbitrary." *Holden v. Police Board*, 324 Ill. App. 3d 862, 868 (2001).

¶ 146    In making the following determinations, we have taken into consideration that we have vacated numerous of the Board's findings. We have also considered Investigator Shilling's testimony that, in his experience, the usual discipline imposed for an officer's unauthorized secondary employment is a three- to five-day suspension. Holmes's testimony, although found to be generally not credible, supported this assertion.

¶ 147    Lastly, we have taken into account the discipline imposed on Holmes and on correctional officer Miguel Saucedo. While we recognize that Holmes's sanction was not under the purview of the Board, we find that, given Holmes's central role in this enterprise, the penalties

meted out to plaintiffs are grossly disproportionate to the penalty imposed on Holmes. Holmes, by his admission, was the person who, with Tinoco, put the entire enterprise into place and worked security himself. He was a ranking officer in the Sheriff's department who ignored all the orders and regulations in effect regarding secondary employment and recruited his subordinates to participate in the scheme and yet was only suspended for 60 days and given a temporary reduction in rank. Holmes's role is generally referred to as the "hub" in an illicit conspiracy. It is the hub that usually garners the harshest sanction, not the spokes.

¶ 148     With regard to Saucedo, the Board found Saucedo violated general orders 3.8(III)(D)(6) (refrain from engaging in off-duty behavior that would reflect negatively on the department), 4.1(III)(A)(17) (engage in conduct unbecoming a DOC employee) and 4.1(III)(A)(18) (make a false official report) and sentenced him to 180 days' suspension. The Board based its findings on testimony showing that Saucedo frequented a bar/tavern owned by a friend where he often assisted in calming or removing unruly customers, he took his handcuffs and weapon into the bar and he told OPR that he did not bring his handcuffs and weapon into the bar. There was also testimony from a bar patron that Saucedo had assaulted and beaten him at the bar, from a responding police officer who thought Saucedo was working security for the tavern and from the bar's owner, who testified that Saucedo helped in calming unruly patrons but was never on his payroll. In Saucedo's OPR statements, he admitted he frequented the establishment and assisted in removing unruly customers but asserted that he was not employed there and never took his handcuffs or weapon into the bar.

¶ 149     Based on the foregoing, we direct the Board to reduce the suspensions of Roman and Herrera to 15 days and DeSena to 20 days. With a baseline of a 3- to 5-day suspension for unauthorized secondary employment, the additional violations found against these officers do not justify 40- and 45-day suspensions.

¶ 150     With regard to Cerami, taking into account that he admitted his unauthorized secondary employment but failed to report the Pineda incident, we direct the Board to reduce his suspension to 90 days.

¶ 151     Given that all findings against Yerena are vacated, the Board is directed to vacate his termination and reinstate him retroactively.

¶ 152     With regard to Verner and Davis, while we certainly cannot condone being less than forthright in the investigation, absent any other aggravating factors and taking into account all of the above, we find discharge was a grossly disproportionate sanction, especially when considering the leniency with which Holmes and Saucedo were treated. We are hard-pressed to understand why Holmes's egregious conduct was not a substantial shortcoming rendering continuance in office detrimental to the discipline and efficiency of the service while Verner's and Davis's lesser conduct was such substantial misconduct or incapacity that discharge was warranted. Similarly, although Saucedo routinely manhandled patrons at a bar and handcuffed them, albeit as a favor to a friend rather than as a paid employee, and lied to the OPR investigator regarding taking his handcuffs and weapon into the bar, he was only given a 180-day suspension. Contrast this with Verner, who was terminated even though no battery charges had been proven against him, and Davis, who was terminated even though he was the victim of a battery, not the aggressor. Accordingly, we direct the Board to vacate the terminations of Verner and Davis, reinstate Verner and Davis retroactively and reduce the penalty imposed on them to a 180-day suspension.

¶ 153                                    CONCLUSION

¶ 154         For the reasons stated above, we affirm in part and reverse in part the decisions of the trial
court. And remand to the Board with directions.

¶ 155         Affirmed in part and reversed in part; cause remanded with directions.